(92 N. W. Rep. 798.)

---

### KATIE A. LITTLE *vs.* STEPHEN BRAUN.

---

**Deed Absolute in Form—When a Mortgage.**

Action to have a deed of warranty, which is absolute in form, adjudged to be a mortgage in effect, and to redeem from the same as a mortgage. The complaint alleges, in substance, that the defendant loaned the plaintiff the sum of $302 and that to secure such loan it was agreed that plaintiff should execute and deliver the deed of warranty in question, and that such deed was executed and delivered with the express agreement that, as between the parties thereto, it should operate as a mortgage to secure the loan. The complaint further avers that in making the loan and in entering into said agreements the defendant was represented by one M. A. Wipperman as defendant's agent. Evidence examined, and *held* that plaintiff and defendant did not, at any time, or in any manner, agree to, accept the deed in question as a mortgage to secure the alleged loan, and that no such loan was ever made in fact.

**Agreement by Agent.**

*Held,* further, under the evidence, that said M. A. Wipperman did not, at any time in question, act in the premises as the agent of

the defendant; nor did he, as such agent, agree to any loan to plaintiff, nor did he ever agree, in behalf of the defendant, that the deed should operate as a mortgage.

**Evidence—Intention of Parties—Parol Defeasance.**

*Held,* further, under the evidence, that the deed, when delivered, was intended to operate as a deed absolute, and that the evidence to show a parol defeasance falls short of that high degree of proof required by an established rule of evidence in this class of cases. Jasper v. Hazen, 4 N. D. 1, 58 N. W. Rep. 454, 23 L. R. A. 58, followed and applied.

Appeal from District Court, Richland County; *Fisk,* J.

Action by Katie A. Little against Stephen Braun. Judgment for plaintiff. Defendant appeals. Reversed.

*J. A. Dwyer* and *Charles E. Wolfe,* for appellant.

*Freerks & Bessie,* for respondent.

WALLIN, C. J. In this action the plaintiff is seeking to have a deed of conveyance, which is absolute in form, adjudged to be a mortgage. It is conceded that on April 18, 1898, the plaintiff was the owner of a quarter section of land in Richland county; that on said date the plaintiff (joining therein with J. H. Little, her husband) executed a deed of conveyance of said land, in which the defendant was named as grantee, and which deed was in the usual form of a deed of warranty, and purported to convey the land to the defendant in fee simple. Said deed was on said date delivered to one M. A. Wipperman by the plaintiff, with the intent that the same should be delivered to the defendant, and the same was delivered to defendant, and subsequently, and on the 21st day of April, 1898, the deed was filed for record, and was thereafter duly recorded. The complaint alleges, in effect, that the parties to the deed intended that the same should operate as a mortgage, and that it was given and received as security for a loan of $302, which loan, it is alleged, was made by the defendant to the plaintiff, and that such loan was the sole consideration for the deed. Plaintiff further alleges that at the time of the delivery of the deed it was expressly agreed between the parties to the deed that the defendant would reconvey the premises to the plaintiff upon payment of said sum of $302. The complaint also states that prior to the commencement of this action the plaintiff offered to pay the defendant the "amount of said loan," and that defendant refused to accept the same and claimed to be the owner of the land. Plaintiff, as relief, demands that the defendant be compelled to accept the amount due on the loan, and to reconvey the land to the plaintiff. The defendant, by his answer to the complaint, in effect denies that the deed was intended to be a mortgage, and denies making the alleged loan, and alleges that the defendant purchased the land of the plaintiff for a consideration of $350, and that said defendant acquired an absolute title to said land by the deed, subject only to a first mortgage of $530 to the state of North Dakota.

It is conceded that a prior mortgage on the land had been foreclosed, and the land sold at foreclosure sale, prior to the execution of the deed in question, and at the date of the execution and delivery of the deed only a few days remained within which the land could be redeemed from the foreclosure sale. It is further conceded that a large part of the land was under cultivation, and that the plaintiff and her husband had, in the fall of 1897, at considerable expense, plowed the cultivated land, and that when the deed was made the land was in condition to be seeded, and that it was in fact soon after seeded by the plaintiff, and the plaintiff, in the year 1898, raised a valuable crop of wheat on said land. The undisputed evidence shows that the plaintiff's husband was much involved in debt, and that neither plaintiff nor her husband had any means or resources outside of the land in question, which could be made available in redeeming the land from said foreclosure sale. It appears that it required something over $900 to redeem the land. The evidence shows that for some time prior to the execution of the deed plaintiff's husband, acting for plaintiff, had been making efforts to raise the sum needed for the redemption of the land, and that, aided by Wipperman and others, he had succeeded in negotiating a loan from the state of the sum of $530, which amount was secured by a first mortgage upon the land in question: But the sum of $530 was not enough to enable the plaintiff to redeem from the foreclosure sale, and hence the plaintiff, represented by her husband, who called to his assistance said M. A. Wipperman, applied to several persons for an additional loan, to be secured by a second mortgage upon the land. But the applications for such additional loan were severally and in all cases refused, and such refusal was placed upon the ground that parties who had money to loan did not regard the security offered as adequate, and hence refused to make such additional loan on the security offered. It was in this conjunction that the defendant was applied to by M. A. Wipperman for an additional loan to plaintiff of $350, to be secured by a second mortgage upon the land. At the time the application for a loan was made no one was present except Wipperman, representing the plaintiff, and the defendant and they alone have testified as to what was said and done in the premises. Their testimony is, however, entirely harmonious, and it stands in this record uncontradicted. Mr. Wipperman, after testifying to the unsuccessful efforts which were made to secure the additional loan from others, said, referring to the defendant, as follows: "I went to Steve Braun about the first time Mr. Little was in, and Mr. Braun said, 'No; with that amount of money against it, he wouldn't make a second loan'; and I told Mr. Little so. 'Well,' he said, 'if it wasn't for the plowing that I done on the land, I would simply let it go by default, and let the sheriff's deed be issued.' I went up to Mr. Braun again, and asked him if Mr. Little and Mrs. Little would deed to him if he would furnish that money. I didn't say that Mrs. Little said so. I asked Mr.

Braun if they would deed to him if he was willing to furnish the money. He was not anxious to do that. He said he considered the land in a sandy region. I afterwards got Mr. Braun to take a deed with the understanding Braun was to furnish the money, provided Mr. & Mrs. Little would give a deed." Referring to the crop expected to be raised that year, Wipperman testified, in substance, that it was agreed between himself and Braun that plaintiff should have the crop. Mr. Wipperman was asked whether there was any talk between himself and the defendant about the transaction being a loan, or about paying the money back to defendant. To this he answered, "There was not." Again, this question was asked: "Q. Any understanding between you and Mr. Braun that any note should be given or any rate of interest fixed? A. There was not." Mr. Braun testified as follows: "Q. What conversation did you have with Mr. Wipperman relative to the furnishing this sum of money? A. Well, he first wanted a loan as a second mortmortgage, but I told him that I would not consider it at all. Later on he came to me and says: 'Will you take a deed for this land and assume the mortgage?' Q. What mortgage was this? A. That was the state loan,—the $530 mortgage to the state. I considered it, and I told him later on I would take it on a deed." Defendant further testified that he did not see the plaintiff or her husband before the deed was executed and delivered to him; that when Mr. Wipperman delivered the deed he paid over $350 to Wipperman; that there was no understanding or agreement between himself and Wipperman that the deed should operate as a mortgage, or that he (Braun) would reconvey the land to the plaintiff at any time upon repayment of the sum paid over to Wipperman. When asked what reason, if any, he gave to Wipperman for refusing the loan, he testified, "I simply said that I did not want anything to do with a second mortgage of any kind."

It is conceded that, after the arrangement between defendant and Wipperman was made, the deed in question was executed by the Littles, and that the same was delivered to Wipperman by the Littles, knowing that the same was to be turned over to the defendant, and the deed was in, fact promptly delivered to defendant by Wipperman, and at the same time the defendant paid to Wipperman the sum of $350, which amount was in fact used by Wipperman in redeeming the land from the foreclosure sale. No claim is made that any note was executed for the $350, nor that any time was ever agreed upon or mentioned at which the money was to be repaid to defendant. Nor is any claim made that any rate of interest was ever agreed upon or mentioned by any one as compensation for the use of the $350. In our judgment, the only material conflict in the evidence relates to what was said as between the plaintiff and her husband on the one side and M. A. Wipperman on the other, at the time the deed was executed and delivered to Wipperman by the plaintiff and her husband. But as to this transaction there is a subtsantial conflict. It

appears that, after the defendant had acceded to Wipperman's proposition to accept a deed of conveyance of the land and advance $350 for the purpose of redeeming the land (provided the Littles were willing to execute and deliver a deed), Wipperman filled out a deed, and, taking the same with him, went to the residence of the Littles, where the deed was executed and delivered. At the time the deed was signed by plaintiff and her husband, there was present besides M. A. Wipperman one Jay Russell, and all of these parties testified as to what was said on the occasion. Mr. Wipperman testified as follows: "I went down to Mr. Little's, and I met Mr. Little outside, next to the barn, and this is the remark that he said to his wife: He says, 'Mama, Mr. Wipperman had a hard time to get the money to redeem that quarter of land, and he says we have got to deed it to Mr. Braun,—that tract of land,—but we are going to get that crop, and have the benefit of the plowing.'" Mr. Wipperman, referring to the deed, testified as follows: "After the matter was all taken, Mr. Little asked me that, if the crop of the same year would prove satisfactory, if Braun would deed back to him that piece of land. In answer I said, 'I don't know, but you know he was not very anxious to put any money into the land.' That is as near as I could give you the conversation." Wipperman testified emphatically that nothing was said by any one present when the deed was executed about obtaining a loan from Braun, or about giving a note or paying interest to Braun. Mr. Wipperman was asked: "At that time, Mr. Wipperman, was anything said about the deed, Exhibit A here, being a mortgage? A. There was not. Q. Was anything said about its being a trust deed? A. It was not." Wipperman further testified, in substance, that the plaintiff and her husband fully understood that they were conveying the land by warranty deed, and that Braun took absolute title to the land, subject to the state mortgage, but that the Littles reserved and were to have the crop grown on the land for the then current year, 1898. But, as opposed to this testimony, the plaintiff and her husband and Jay Russell were sworn as witnesses for the plaintiff. The plaintiff testified as follows: "I refused to sign the papers, because I understood, before he came out there, that this was a second mortgage, and I objected to signing a deed; and he told me it was just the same thing, and had to be foreclosed, before anybody could get possession of the ground; it was just the same as a second mortgage. And he said he had to have it that way in order to get the money, because there was not very much time left to get the money, and he couldn't go any place else because there was not any more time, and that Braun insisted upon having it that way. It was just the same as a second mortgage, so far as I was concerned." This witness was asked: "State what particular thing he called this deed. A. Second mortgage. Q. Did he use the words 'trust deed'? A. Yes, he told me trust deed was just the same as a second mortgage." Plaintiff further testified: "He said,

'This money can be paid back any time. Mr. Braun will be only too willing to get this money;'" and further testified, referring to Mr. Wipperman's agency in the premises: "My husband—— I understood he was acting for my husband and myself in making this loan. Q. But had you employed him as your agent in any way to sell your land? A. That was not talked of. I never had any intention of selling the land." Jay Russell testified, in substance, that Mrs. Little did not want to sign the deed, but was willing to sign a mortgage, and that Wipperman said the deed was the same thing, and that, if they paid back the money, they could have their land. Mr. Little's testimony corroborated that of his wife as to what was said by Wipperman as to the nature and operation of the deed,—that the deed was, in effect, a trust deed, and would operate as a mortgage. Little also testified that, acting for the plaintiff, he had called on Mr. Wipperman to assist in raising the money by a loan with which to redeem from the foreclosure sale. The land has been in plaintiff's possession at all times since the execution of the deed, but this possession, after the year 1898, was without the consent and against the wishes of the defendant. It appears that Braun paid the taxes on the land.

The evidence shows that about one year after the delivery of the deed Mr. Little saw defendant, and requested him to make a statement of the amount the defendant claimed to be due him on account of the deed transaction; Little assuming at this interview that the deed was to operate as a second mortgage. The defendant promptly informed Mr. Little that he (defendant) claimed the ownership of the land, and that he considered that he had no statement to make to Little. Mr. Little stated to defendant, in this interview, that the deed was "nothing but a trust deed," and during the interview the defendant said to Little, "If you can get your money here in thirty days, I will make agreeable arrangements with you." We can find nothing in this interview, as disclosed by the evidence, which is significant, and certainly nothing at all decisive to the rights of the parties. Long prior thereto their respective rights and relations in this matter had become fixed. At the interview Braun claimed that he was the owner of the land, while Little, on the contrary, insisted that the deed under which Braun claimed title was "only a trust deed." True, Braun said to Little, during the talk, "If you can get your money here in thirty days, I will make agreeable arrangements with you." But this language certainly does not amount to a concession of plaintiff's ownership. What was meant by the phrase "agreeable arrangements" does not clearly appear, but this language, while ambiguous, is not at all inconsistent with Braun's absolute ownership of the land, which ownership Braun distinctly asserted at the same interview. We cannot, therefore, attach much weight to this feature of the evidence; nor can we see that its tendency was to impeach the testimony of Braun, or to show that Braun at that time thought that he was not the absolute owner of the land. He cer-

tainly then and there asserted his ownership, and did so in clear and unambiguous language.

Counsel on both sides, in presenting their views to this court, have put much stress upon the matter of M. A. Wipperman's agency. Counsel agree—and must do so under the evidence—that Wipperman did not act in his own behalf, but, on the contrary, acted at all times in question in a representative capacity. Counsel, however, differ widely as to the extent and character of his agency, and especially differ upon the question of whose agent he was at the time the deed arrangement was made with the defendant and when the deed was executed and delivered by the plaintiff. We quite agree with counsel that the matter of Wipperman's agency is a factor of prime importance in the solution of the legal problem presented. It is undisputed that Wipperman acted for the plaintiff, to some degree, at least, in obtaining the loan of $530 from the state; and the plaintiff's own evidence, as well as that of Wipperman, conclusively shows that Wipperman was also authorized to represent the plaintiff in soliciting an additional loan as a means of meeting the exigency presented by the foreclosure sale. It distinctly appears, and the fact is not denied, that with the knowledge of the plaintiff's husband, who also acted for plaintiff, Wipperman applied to divers parties, among them the defendant, for such additional loan; and, further, that plaintiff's husband was informed of the fact that the defendant, as well as others applied to for a loan, had refused to make an additional loan on the security offered by the plaintiff, viz., upon a second mortgage. This evidence shows, and the fact is conceded, that in all things done or attempted by Wipperman about the matter of securing a loan for plaintiff's benefit, Wipperman was the duly authorized agent of the plaintiff, and acted as such. That he acted in good faith in all that he did in his efforts to negotiate a loan cannot be questioned under the testimony; nor is there an allegation in the complaint to the effect that either Wipperman or the defendant acted fraudulently in procuring the execution of the deed. The complaint is framed upon the sole theory that the defendant agreed with plaintiff to make a loan to plaintiff of the sum of $302, and that such agreement was made by the defendant through M. A. Wipperman, it being distinctly alleged that Wipperman was defendant's agent in making such agreement for a loan and in procuring the execution of the deed to secure the same. It therefore is a matter of the first importance to ascertain from the evidence who it was that Wipperman represented when the arrangement was made with defendant for the execution of an absolute deed, and also at the time the deed was executed and delivered. In this investigation we start with the fact that there is no evidence in the record of any express authority from the plaintiff or from her husband giving Wipperman a right to sell the land, or to offer the same for sale. On the contrary, the evidence tends to show that the first suggestion of an absolute sale of the land came from Wipperman himself. Con-

cerning this point we have the uncontradicted testimony of Wipperman. After testifying that defendant refused to make a loan on the security offered, and that he informed plaintiff's husband of such refusal, and after stating that plaintiff's husband said, "If it wasn't for the plowing that he had done on the land, he would let the land go by default, and let the sheriff's deed issue," Wipperman testified as follows: "I went up to Mr. Braun again, and asked him, if Mr. Little and Mrs. Little would deed to him, if he would furnish that money. I didn't say that Mrs. Little said so. I asked Mr. Braun, if they would deed to him, if he was willing to furnish the money. I afterwards got Mr. Braun to take a deed with the understanding Braun was to furnish the money provided Mr. and Mrs. Little would give a deed." Braun's testimony is also clear to the point that Wipperman first broached the suggestion that an absolute deed be obtained from the Littles. So far as appears, the suggestion was made before the Littles had been consulted, and the entire arrangement between defendant and Wipperman as to obtaining the deed was wholly conditional, and depended upon whether the Littles were willing to dispose of the land, and transfer the title by a deed. The defendant, while on the stand, was repeatedly asked whether, in his negotiations with Wipperman relating to the deed, the latter assumed or pretended that he was representing him (the defendant) in the matter. To these questions apparently contradictory answers were made. He twice answered, in effect, that Wipperman did not assume or pretend to represent him, the defendant. Once he answered that Wipperman was acting for him in the matter. This testimony wound up as follows: "Q. He was to get this deed, and you were to pay the money? A. Yes, that is all there is of it." This testimony, standing alone, as we view it, leaves the question of agency unsolved, and affords little or no aid to the court in reaching a conclusion upon the question. Hence a solution must be sought in the facts and evidence elsewhere disclosed by the record. We have perused the evidence with great care, and have been unable to find a scrap of evidence in this record tending to show that the defendant ever at any time gave Wipperman any instructions or directions to procure any deed from the plaintiff, or at any time ever requested him to obtain the deed in question, or to obtain any deed from the plaintiff. On the contrary, the evidence is undisputed that defendant at all times refused 'to advance the money necessary to redeem the land as a loan, or to have anything whatever to do with any second mortgage; and yet, if plaintiff's theory of the facts is accepted as correct, the defendant did agree to make a loan, and to do so upon an instrument which, under the law and the existing circumstances, would be a second mortgage, and nothing else or better than that. But, as we have said, there is no evidence tending to show that Braun ever agreed to loan the plaintiff any money on any terms whatever.

N. D. R.—27

If the court could, without evidence of such fact, indulge the theory that Wipperman, in procuring the execution of the deed, acted under instructions from the defendant, and as defendant's agent, it would then become necessary to accept the consequences of placing Wipperman in that relation to the defendant. It would necessarily follow from the supposed agency that all which Wipperman said and did within the scope of such agency was done pursuant to the defendant's instructions, and upon this supposition the conclusion could not be escaped that defendant, after refusing to make the loan, actually loaned $350 to plaintiff, not only upon a second mortgage, but did so without taking a note, without any agreement as to a rate of interest, and with no agreement on plaintiff's part to pay the debt at any particular time. All this will logically follow and cannot be avoided if the court shall accept the plaintiff's theory that the defendant, acting through Wipperman, agreed to make the loan and accept the deed as an instrument of security. There is no claim that Wipperman exceeded or violated any of defendant's instructions in the matter of procuring the execution of the deed, nor do counsel for respondent, in their brief or otherwise, broach any such theory. But, as we view the facts disclosed by the record, there was nothing wrong or unnatural involved in the suggestion which was made to defendant by Wipperman to the effect that defendant should purchase the land upon the terms suggested. At the time the suggestion was broached by Wipperman, he well knew that a crisis had been reached in plaintiff's financial affairs. She had, without success, faithfully sought a loan, to be secured by a second mortgage, and her agent, Wipperman, and her husband, could do no more for her in that direction; and hence the plaintiff was confronted by the alternative of losing the use of the land for the year 1898, and also sacrificing all that it had cost to prepare the land for seeding. There was very little time in which to act. In this emergency, Wipperman—we think quite naturally and properly—conceived the idea that a sale outright would be far better for the plaintiff than to permit a sheriff's deed to issue under the foreclosure. If the sheriff's deed issued, the plaintiff would be evicted from the land, and, as a result, would lose the use of the land for the crop of 1898, and also lose all that had been invested in preparing the land for such crop. In this state of plaintiff's affairs, we think a proposition to sell was a reasonable and natural one, coming, as it did, from an agent of the plaintiff, who had long tried without success to negotiate a loan, and thereby tide over the emergency. Having found a purchaser willing to buy, and who offered to buy on certain terms, which included an offer to allow plaintiff to crop the land for the current year, it was a natural thing to do at least to submit such offer to the plaintiff and her husband; and, in our judgment, it would have been an act of folly if the offer had been refused by the plaintiff, under the circumstances disclosed by the evidence; and we have reached the conclusion that the offer was

accepted, and that the deed was signed and delivered as a deed of absolute conveyance, and was not made as a security for any loan. We are fully aware of the fact that the plaintiff and her witnesses testify that Wipperman represented that the deed was a trust deed, and that it was to operate as a mortgage; but this testimony is most ephatically denied by Wipperman, and it is also confronted by the stubborn facts which inhere in the transaction, and to which we have already referred at length. The deed itself, by its terms, testifies strongly against the notion that it was intended to operate as a mortgage, and to this must be adder the established fact that no loan was ever agreed to be made, and the further significant fact that none of the ordinary incidents of a loan accompanied the giving of the deed. If Wipperman, as the complaint charges, acted as the defendant's agent in procuring the deed, and in doing so (in direct violation of the arrangements made between the defendant and himself) proceeded to accept the deed as a mortgage he was not only guilty of an act of gross treachery, but to this he added the crime of perjury, and on this theory all this he has done without any apparent motive other than that of sheer diabolism. There is no evidence in the record tending to show that Wipperman has any interest in the result of this litigation, and he testified that he has no interest whatever in the litigation. But upon the record this court has reached the conclusion that Wipperman did not represent the defendant in procuring the execution and delivery of the deed, and we are compelled to go further, and hold that Wipperman, in procuring the execution of the deed, acted as the plaintiff's agent. It is conceded that he was representing the plaintiff in all the efforts which he put forth in the way of soliciting a loan upon a mortgage as a means of redeeming the land, and it distinctly and affirmatively appears from all the plaintiff's evidence that Wipperman at least professedly acted as her agent in all that he stated to the plaintiff when he presented the deed to her for execution. He had been previously clothed with authority to solicit a loan for the plaintiff's use, and when the deed was presented for execution the plaintiff testified to the effect that Wipperman said that the deed was to be given and received as a mortgage to secure a loan to be made by the defendant to plaintiff, and that defendant would not make the loan unless it was made upon a deed as security. It is further true that plaintiff and her witnesses testified to the effect that Wipperman assured the plaintiff that the defendant would reconvey the land to the plaintiff upon payment of the loan. Upon these assurances the plaintiff, according to her evidence, delivered the deed as a mortgage to secure a loan, and did so with intent that the same should be delivered by Wipperman to the defendant, and the deed was delivered by Wipperman to the defendant. Upon the plaintiff's evidence, therefore, it is manifestly true that Wipperman was at all times the plaintiff's agent. It is also true that upon the plaintiff's evidence Wipperman, in obtaining the deed, was guilty of a gross deceit and fraud; but this concession does not militate in the least

against the fact that such supposed fraud was the act of plaintiff's own agent, and therefore a fraud, for which the defendant cannot be held responsible, either in law of in good morals. The evidence makes it entirely clear that· the defendant is personally guilty of no deceit or fraud whatever, and none is charged against him in the complaint. He bargained for an absolute deed of conveyance, and received such a deed, and did so, so far as appears, innocently, and in the usual course of business. Our conclusion is that, in any event, and however viewed, the testimony in this case falls far short of that high degree of proof which is required in cases where a party seeks by oral testimony to establish a defeasance, and to impeach and destroy a deed or other solemn instrument which has been deliberately reduced to writing and signed by the parties who seek its destruction. The rule as to the degree of proof in such case is voiced in an opinion of this court, formulated by BARTHOLO= MEW, J., as follows: "Courts have with great uniformity in this class of cases required the proof that should destroy the recitals in a solemn instrument to be clear, specific, satisfactory, and of such a character as to leave in the mind of the chancellor no hesitation or substantial doubt." See *Jasper* v. *Hazen*, 4 N. D. 1, 58 N. W. Rep. 454, 23 L. R. A. 58. ·This case has been cited with approval in the following case, *McGuin* v. *Lee*, 10 N. D. 161, 86 N. W. Rep. 714, and see the recent case of *Sargent* v. *Cooley* (decided this term), 94 N. W. Rep. 576.

The conclusion we have reached necessitates an order reversing the judgment of the trial court, and such order will be entered, together with an order directing a judgment to be entered in the district court denying the relief demanded in the complaint, quieting the title to the premises in the defendant, and also awarding the possession of the land to the defendant. All the judges concurring.