## EMMA C. SCHINZER v. JOHN WYMAN.

(146 N. W. 898.)

**Contract — power to cancel — court of equity — exercised only in clear case — fraud.**

1. The power to cancel a contract will not be exercised by a court of equity, except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear.

**Evidence — fraud — undue influence — failure to show.**

2. Evidence examined and *held*, neither to show fraud nor the use of undue influence.

Opinion filed March 25, 1914. Rehearing denied April 22, 1914.

Appeal from the District Court of Cass County, *Pollock*, J.

Action to have declared null and void and to set aside two war-

---

Note.—On the question of the jurisdiction of equity to cancel instrument on the ground of fraud, see note in 5 L.R.A.(N.S.) 1036.

ranty deeds, a contract for a deed, and a certain receipt relating to said transaction, and for a personal judgment for the amount of certain mortgages placed by the defendant upon the land in controversy. Judgment for plaintiff.

Reversed.

Statement by Bruce, J.

This is an action to have declared null and void and to set aside two warranty deeds, a contract for a deed, and a certain receipt relating to said transaction, and for a personal judgment for the amount of certain mortgages placed upon the land in controversy. Judgment was rendered by the trial court in favor of the plaintiff, from which the defendant appeals and asks for a trial *de novo*.

The gist of the plaintiff's amended complaint is that the plaintiff was a German, and unable to read or write the English language and to understand the English language except with great difficulty; was illiterate, and an ignorant woman of weak understanding and ignorant of business affairs, and had no understanding of legal documents, and was a person easily influenced, all of which facts were well known to the defendant; that the plaintiff had known defendant for a period of about a year and a half, and that in the summer of 1910 she purchased from said defendant at defendant's solicitation a tract of land known as the Argusville farm; that shortly after defendant's acquaintance with plaintiff, and about the time of said purchase and ever since, the defendant had counseled and advised the plaintiff in her business affairs and acted as her agent in various transactions; that the relations between them during all of said time had been those of intimate friendship, and that the plaintiff during all of said times had implicit confidence in the defendant, and was easily influenced by him, which facts were well known by the defendant; that the plaintiff came to Fargo on the 5th day of June, 1911, at the solicitation of the defendant; that during her stay in the city she was made the guest of the defendant and his family, and that the relations between them appeared to her to be of a most friendly and cordial nature; that during such stay the defendant took her about the county, and showed her a certain tract of land known as the Barry farm, and tried to induce her to buy it, more particularly on the 11th day of said month, when "the defendant tried

to persuade and counsel the plaintiff herein until the late hours of the night, trying to induce the plaintiff to purchase the said premises; that the plaintiff herein informed the said defendant that she was unable to purchase the same, and refused so to do;" that the defendant told her that her lands in Cass county, the Argusville farm, could be sold for $59 an acre cash, and her Minnesota lands, the Glyndon farm, for $55 an acre cash, and urged the plaintiff to authorize him to sell such lands at said prices, and requested the plaintiff to reduce to writing the authority authorizing the defendant to sell the said premises at said prices, to which she consented; that thereafter and prior to 9 o'clock and 30 minutes in the forenoon of the 12th day of June, 1911, the defendant requested the plaintiff to call at his office, saying that he would prepare for plaintiff's signature contracts' authorizing defendant to act as plaintiff's agent in selling plaintiff's said premises at said prices in cash; that pursuant to said request plaintiff arranged to call at defendant's office, but before reaching the office was taken ill and was suffering considerable pain in body and mind; and that the defendant met said plaintiff in her said condition, and knew of her said illness and condition, and brought said plaintiff to his office; and that the plaintiff then and there notified said defendant that she intended to take the train at Fargo at 9:30 o'clock in the forenoon of said day, and that plaintiff, in addition to the suffering in body and mind from the said illness, and knowing that she had but a few minutes to take said train, and her attention being concentrated in arranging to take said train, she was unable to fix her attention upon and understand the effect of legal documents when described to her, all of which facts were well known to the defendant; that knowingly taking advantage of plaintiff's age, residence, condition, her inability to read or write the English language and understand the same except with great difficulty, and the fact that she was illiterate and an ignorant woman of weak understanding and ignorant of business affairs, and that she had no understanding of legal documents, and that she was a person easily influenced, and knowing the implicit confidence plaintiff had in defendant, and knowing that plaintiff was suffering in body and mind from said illess, and that plaintiff was about, in a few minutes, to take said train at Fargo for her home in Illinois, and knowing that plaintiff's attention was concentrated in arranging to take said train within a few minutes

thereafter, and knowing that plaintiff was unable to fix her attention upon and understand the effect of legal documents, and that plaintiff was a person easily influenced, especially by the defendant, said defendant thereafter and before the leaving of said train on said 12th day of June, 1911, taking advantage of plaintiff's said above condition and circumstances and the relations existing between the plaintiff and the defendant, *knowingly, falsely and fraudulently presented and handed to the plaintiff for her signature certain papers, and knowingly, falsely, and fraudulently represented to said plaintiff that each and all of said papers were originals and copies of papers appointing the same defendant agent of the plaintiff to sell and dispose of plaintiff's said lands (the Glyndon and Argusville tracts), for the respective prices in cash hereinbefore mentioned;* that plaintiff being unable to read or write the English language and understand the same except with great difficulty, and being illiterate and an ignorant woman of weak understanding and ignorant of business affairs, and having no understanding of legal documents, and having implicit confidence in defendant, and on account of the relations existing between the plaintiff and defendant, and suffering in body and mind from her said illness and arranging to take said train at Fargo for her home in Illinois, and being unable to fix her attention upon and understand the effect of legal documents, and being easily influenced by the defendant, and relying upon said representations of the defendant, *and believing them to be true, and having no knowledge of the falsity of the same, plaintiff signed each and all of said papers presented to her by defendant for her signature*—the said papers actually signed being deeds to Wyman of the said Argusville and Glyndon tracts, and a contract for purchase of said Barry farm.

According to our construction of the evidence in the case the defendant, John Wyman, was fifty years of age and a shrewd business man with large experience. The plaintiff had been born in and was a resident of the state of Illinois, and had been a widow for about twelve years. She was about forty-seven years of age and could speak and write English fairly well, though she was more at home in her native tongue. She had no understanding of the technical terms of legal documents. She in the main relied in business matters upon advisers, particularly her local bankers, but seems to have been able to write intelligent business letters. She seems to have been confiding in her

nature, and a person who was easily influenced. At the death of her husband she was left in the possession of some 225 acres of land and personal property. Her exact title to this land is not shown. The land was encumbered with mortgages to the extent of about $7,000. During the twelve years intervening between the death of her husband and the trial, she seems to have been able with the help of her boy, now fifteen years of age, and the advice of the local bankers, to have so successfully conducted the working of her land that she was able to pay off the encumbrances, and to buy a farm in North Dakota known as the Argusville farm, containing 320 acres, and what is known as the Glyndon farm, in Minnesota, which contained 185 acres. This last farm was purchased about eight years before the trial, and plaintiff appears to have visited it twice, and to have had the same looked after at first by neighbors and then by the banker at Glyndon, most of the correspondence with the "neighbors" and the Glyndon banker seeming to have been carried on by the plaintiff herself. At various times contracts appear to have been made in duplicate, which she signed and returned to Minnesota. The defendant and plaintiff first met in 1910. Defendant had a local agent in Ashton named Phillip Brown. In that year Brown brought a number of people from Ashton to look at lands. The plaintiff accompanied this party, and at that time examined various tracts, among them what is known as the Argusville farm. She did not buy at that time. Defendant Wyman seems to have seen her on this trip for the first time, and some ten days later went down to Illinois, and consummated the sale of what is called the Argusville farm. The purchase was made as a speculation, the plaintiff having made out of her Glyndon farm investment a higher rate of interest on the whole than she could have earned at the local banks, and perhaps being encouraged by that fact to make the purchase. At the time of the sale defendant leased the Argusville tract from her for the year 1911, agreeing to pay a cash rental of $4 per acre. The deal was consummated through the Ashton bank. Following this sale the defendant visited the plaintiff at Ashton, Illinois, three or four times, he evidently having agents and customers in that locality. On all of such occasions he visited her at her home, and seems to have asked that he might handle her business for her, and at any rate induced her to sign three notes for an aggregate of about $13,000 as an accommodation indorser, stating

that in North Dakota interest was so high that poor people could not do anything. For this accommodation, which allowed him to discount the notes in Illinois at a lower rate than he could have done in North Dakota, he paid her about $460. He told her that "it was cheaper for him to get money that way than to borrow here." Later, and on October 21st, 1910, he wrote her in regard to the notes, and on October 5th wrote as follows:

Dear Mrs. Schinzer:—

I dictated short business letter to you other day. I intended write you myself, but I did not have time. First of all I thank you very much for your business, and also courteous way you have treated me, and helped me to get money on August Griese notes. I wish you could come up here and spend few days, and enjoy some sociable life. I am sure you would like Fargo and our people here very much, and would also like your farm more now, because we had rains up here, so all grain on that farm is looking fine. I am coming to Iowa and Illinois perhaps some time during next week, and if can spare time I will call on you again, and will explain to you how you can make from 2 to 4 per cent, and perhaps great deal more on some money, that being loaned in your part of country at rate of $4\frac{1}{2}$ to 5 per cent. I enjoyed time very much I spent at your home, and will be very glad return compliments in some substantial way to show you that your kindness is highly appreciated. Will be glad to hear from you again before I start on my trip.

On October 10th he again wrote her that he was sorry she was having bad luck with her Minnesota farm, and that sometime when she came up he would make arrangements to look after it, or sell it and get her a more desirable farm; also that he expected to be in Illinois last of that week and would call on her. He also stated that he often wished that she was in North Dakota to take auto rides with him to see her farm and others. Again on May 3, 1911, he wrote her, asking at just what time she was going to come up and stay with him a couple of weeks, and to let her boy come up with her, and to let him know how soon school would be out so that her boy could come. On the 26th of May, 1911, he wrote her that she should not be afraid to come alone, and gave her directions how to reach Fargo. He told her that if he was

not at home she would be taken care of, that Mrs. Wyman would take care of her just as well as if she had known her for twenty years. He added, "I want you to be sure and come up, and then later as we can agree you can have your boy sent up. I want you to see your farm that I sold you. Further I want you to come next week, because that is a big celebration here that will start next Monday, and the 5th day of June, and last three days, and the remainder of the week. . . . Prepare yourself to stay here at least a week, as you will have a good time. Rest up a bit, and I want to talk to you confidentially on some business matters." It appears that previous to this last letter, and during one of the conversations that he had with the plaintiff at her home in Illinois, he told her that he wanted her to come up to Fargo and go into business with him. She said he wanted to show her how to make money, and make at least from 10, 15 to 20 per cent, where she did not make but 3 or 4 at home. It appears to us, indeed, to be quite clear that the defendant's main purpose in inviting the plaintiff to visit him in North Dakota was to induce her to go into the real estate business with him. In some of these conversations also, he told her that she should trust her business to him. She testified that he asked her as often as he saw her, and that she said that she was willing, and that she had confidence in him when she said it. There is in the record, however, no real evidence of the actual creation of any agency or trust relationship. She said that when she signed one of the notes as an indorser she told him that she knew she "had ought not to done it, but she couldn't help to do what he told her, and that he would smile at her," and that this was before June 12th, 1911. The plaintiff claims that at this time the defendant was looking after the Argusville farm for her. When plaintiff arrived in Fargo in the first week in June, 1911, the defendant was not at his office, but a young man took her to the defendant's home, and that evening the defendant took the plaintiff and his wife and baby out for an automobile ride. Later on he took her for another ride, and while riding would say, "here is a piece for sale for so much and so much," and that the plaintiff should tell her friends when she got home. He did not show her any land in particular on that day, nor did he say anything in particular about selling her Argusville and Glyndon farms. Two days later the defendant took the plaintiff again, she saying that she had a settlement to make relative to her

Glyndon farm, and he saying that he would take her over there and help her look at it. A little later the defendant, his wife and daughter and the plaintiff, went to look at what is called the Barry farm, the contract for the purchase of which is sought to be aside in this action. On this trip he told her that he wanted her to take particular notice of the two sections, that he wanted her to have them, wanted her to look at the buildings and such like, and she told him that she could not handle it, and he said he would handle it for her, and they looked it over and returned to Mr. Wyman's home. She said that she did not want to look at the land, and told the defendant so. Nothing further was said that day relative to the Barry farm, but the defendant took plaintiff, his wife and daughter, a second time, and said that he wanted her to have that farm, and she told him that she did not think it was any use for her looking at it because she could not handle it. She said that he wanted her to sell her Illinois land and the others, and come to Fargo and buy the Barry farm, and she informed him that she could not sell the Illinois farm, it was not hers, and he informed her that he could swing it without that. Some of these conversations, it appears, were held between the plaintiff and the defendant at defendant's house when they were alone, and at dusk after supper time. On the last Sunday night it appears that the defendant, being with her alone, offered her some beer, himself drank some, and had her drink about half a glass. This was late at night and after Mrs. Wyman had retired. He then asked her to buy the Barry farm, and told her that she might sell the Argusville and the Glyndon farms with the crop, and that the said lands with the advance upon them and the crops ought to be worth $80 an acre. She said that the conversation that evening influenced her, and that it was difficult for her to resist anything that he asked her to do, and she could not say no to what he asked her. She had previously told him that she wanted to go home on the day before, but he did not want her to go. On the following Monday morning he told her she should get ready and come down to his office and sign some papers. He took her, at her request, to a doctor's office in an automobile to have her foot treated for a corn or a similar growth. There she had a small operation performed during which she fainted. She testifies that she told him that she had fainted, but she did not remember that he said anything. She also testified that she told him she was not feeling well. It was about the

middle of the afternoon when he took her to his office. She testified that she had figured on going home, but that the doctor had informed her that she had to stay and take another treatment. When she arrived at the defendant's office he laid the papers there for her to sign. According to her report of the transaction there was not much conversation. He simply got the papers out and told her where to sign them. She signed only two papers, and she signed them because Wyman told her to, and it was because she had confidence in him and believed everything he said. He read part of one paper to her, but she did not know what that part was. He did not finish any papers, and she thought the part he read meant how much the farm should sell for. She says she signed only two papers, and the defendant told her one was for her and one for him. She said she did not think she signed more than two, but said that she did not think that she would know the papers if she saw them. The papers appear to have been a warranty deed of the Argusville farm to Wyman, a warranty deed of the Glyndon farm to Wyman, and a contract for the Barry farm between the plaintiff and the defendant. Upon the trial these documents were shown to the plaintiff, and she said that she did not know what they were, and did not know which one she signed. She testified that she signed only two papers, but she could not pick out the one that she signed, and did not know what she was signing; that he did not tell her exactly what they were; that he simply got the papers and told her where she should sign them; that she signed them because he told her to; that she believed everything he said; that he read part of one of the papers, but she did not know what part. She said she thought that it meant how much that farm should sell for, what the price of the other farm (the Barry farm) was. She said that she did not know that she was selling the Argusville farm and the Glyndon farm to the defendant, and that she did not remember that Mr. Wyman told her that she was; that he gave her no money or consideration for signing them at the time; that he took her to another man. She did not remember whether either of them spoke to her. Both of the deeds, however, appear to have been signed and delivered in the presence of two witnesses, E. A. Engebretson and B. J. Miller, and to have been acknowledged by the plaintiff before the said Engebretson as a notary public. Under the same date there appears to have been executed an agreement or receipt bearing the signature and indorse-

27 N. D.—32.

ment, "Agreed to, Emma C. Schinzer," in which the defendant acknowledged the receipt of the warranty deeds for the two farms in question, and which stated that the same were to be sold by the said defendant on or before March 1, 1912, and that all the proceeds realized from said sales were to be applied on and as part payment of the purchase price of the so-called Barry farm, "this day purchased by the said Emma C. Schinzer, of Ashton, Ill., from the said John Wyman of Fargo, N. Dak." The agreement also provided that the rental of the said farm for the year 1911 was to be applied on such purchase. On the same day there also appears to have been executed a contract for deed from the said defendant to the said plaintiff for the said Barry farm, conditioned upon the payment by the said plaintiff of the sum of $74,999 on or before the 1st day of March, 1912, and the payment of $1 at or before the execution of the contract, and which provided that the said plaintiff should have immediate possession of the land, and that the proceeds of one half of all the crop except the corn should be applied on the purchase price. The said contract, though signed by the said Wyman and the said Emma C. Schinzer, does not appear to have been either witnessed, acknowledged, or recorded, nor is there any acknowledgment of proof of the payment of the $1; in fact, the evidence shows that the same was not paid. These papers do not appear to have been given to the plaintiff until she had left the train at Rochelle, Illinois, on her way home, having been accompanied to that point by the defendant, who was on his way to close his deal with Barrie at Bloomington, Illinois. The defendant, however, testified that the papers were kept by him until such time at the plaintiff's request. When handed to her, she testified, he told her that they should be put in her suitcase, and that she should be careful not to lose them, as they were valuable, though he did not tell her what they were. She testified that after she was home for some time a friend of hers, her doctor, saw them and told her that she should show them to a lawyer. This she did, and was advised to take steps toward undoing what she had done. This attorney seems to have been employed, and to have gone to North Dakota and in turn to have employed A. C. Lacy, Esq., of Fargo, North Dakota, to represent the plaintiff, who on the 30th day of June, 1911, had a cancelation of instrument prepared, which was served on the defendant on the 3d day of July, 1911, on which date the present action was commenced and a

notice of *lis pendens* filed. It appears also from the evidence that the said defendant, immediately after the execution and delivery to him of the deeds aforesaid, and on the 12th day of June, 1911, and evidently without the knowledge of the plaintiff, procured a loan of $6,000 from the Northern Trust Company, and secured the same by a mortgage upon the said east half of section 12, township 114 north of range 50, in Cass county, North Dakota, being the Argusville farm, which said mortgage was not paid or satisfied until the 24th day of June, 1911, and on the 22d day of June, 1911, procured another loan from the same parties of $5,000, and secured the same by a mortgage on the same piece of land, and again on the 18th day of June, 1911, procured from the same parties another loan of $3,000 secured by another mortgage on the Clay county, Minnesota, or Glyndon, tract of land, and again on the 28th day of June, 1911, executed to said Northern Trust Company another mortgage for $575 on the said Clay county, or Glyndon, tract of land. The first knowledge of these transactions came to the plaintiff about September 27, 1911, when her counsel found the mortgages of record. Defendant, however, contends that the proceeds of these loans were credited upon plaintiff's contract to purchase and upon the indebtedness she owed to the defendant, and upon the date of the receipt of the said loans, and alleges that they were placed upon said real estate for plaintiff's benefit, and for the purpose of not only reducing her indebtedness to the defendant, but for the purpose also of facilitating the sale of said lands, and that he had told her he would make them. This claim is also made in regard to the sum of $1,781.89, being rents and profits collected from the said Glyndon and Argusville farms during the year 1911.

On the question of undue influence, the plaintiff admitted on cross-examination that the part of the papers that the defendant read to her related to the so-called Barry farm, that is to say, sections 11 and 12, and that he read her a part which was similar to, "and the said party of the second part hereby covenants and agrees to pay the said party of the first part the sum of $75,000, payable at the office of said John Wyman," and that he might have read the description to her, that she did not remember that, but did remember about the price; that after signing the papers on Monday morning she went on a pleasure trip to Detroit, and came back to Fargo on Tuesday, the 13th, and on that

night started home. She also admits that after reaching home on June 15, 1911, she wrote the following letter to the defendant: "I got home oll right altough it was the highest time. I felt so bat all afternoon I hardly could stant it I got such a bain in my back and side I was sick. I found everything all right. It was just as I told you they all exsbected me Sunday night that is the reason they didend right. I had to work all day. I was hardly able to stand on my feed my well drillers finished that well to night it cost me about $250 dollars, my plumb here at home was broke hat to get it fixed today fore tomorrow there are 100 and 1 thing, waiding for me the charries are all ribe the trees loaded but they are very small it is hart to work with them Frank hangs on me like a baby he said ma, it isend like home when you are gone I intentet to rite to you last night, it was impossible, they all had so much to say. Dear Friend I will try ant thank in a few words fore all the good and kindness you have give me while I was with you. I cant say much. I know you will understand me. Dear friend as long as I was by you I feld so good, now Im alone Im as misrable as ever just think what a terrible burden I but on my shoulders $75000 Dollers, just think of it I tont believe Il ever live trough it I wish I never bought it. Im afraid it is going to brake me up, my head is working rownd and I cant eat or sleep I feel such a weight on my heart how is dear little Mary how are you and Elen and all hoping you are all better than I I must close my close are boiling over. hoping to hear from you I send my love and best wishes to you and all Emma Sch." And again on August 30th, wrote: "Mr. Wyman Dear Sir Mr. Petrie called me by Phone today. when I got there I was astonished to find that you had told him about that terible deal as you had told me not to tell anyone about it, which I truly and honestly didend I never told one sole but the lawyer, and that habend I tont gwite know myself, when I got home in some com pany I said if everything would go all right *I intended to go to Fargo to live* then a friend of mine said I couldend do that, the minet I left my hom, I had no right to come back, I would loose all rights in that home, then came to my mind what you said in the train on our way home, that gave me the last shock It nearly upset my mind, I could find no rest nowhere. I towght I lost everything, then I waided for you did not come then I rote to you you still but me of another week or 2 I could not stand it any longer I went to a lawyer All I wanted I wanted

to find out about my home then he asked gwestions I had to answer, that is how it came I had to tell on you. I never intented to harm you in the least nor anyone else. I read your letter over and over again all I can remember of it is that you said I lied that is harter then a blow in my face I would tought anything before I would believed you do that again me. I always done all I could fore you last fall when you came to me in your trouble I treated you as well as I knew how to helb you get all that money I acomodaded you in every way I could, you know what a hart place I got and what a reck I am, and everything wearyes me so. now Mr. Wymen as a friend of mine you hat ought never let me make such a deel you know I didend wand it, instead of coaxing me you ought to told me to think it over or figer ub the interest ant exsbences to me but you never mentioned the exbense on such a place all I intented the man to do was to ask you if it was not bossible fore you to give me my papers back yow showld waid and not sell my land until I had seen you now you know all of that, still that wasend all yet there was another deal which means $3900 D fore me and then came Yenrick with that $2000 I had sined fore you and now mr. Wymen you know that $5000 D node of yours at the Petrie Bank was due a month ago and you didend mensiown it in your letter why is it now Mr. Wyman but yourself in my blace tont you truly think it is enough to crush the heart of a strong man Where do you think my brains shell land ad I am riting this to you as I have no one to speak to. I cant make up my mind to tell Frank it would crush the Poor child down as he needs all the strength he has fore his studies tell Mrs Wyman to rite to me if she could truly Emma."

Mrs. Wyman also testified that on the morning of the execution of the papers the plaintiff told her that "she had bought the farm and she thought she was going to enjoy it here, and planned on coming up here and spending her summers and living here, had a nice large house, and bringing her son with her, her son would enjoy it so much." The defendant himself denied all charges of undue influence or fraud. He admits inducing the plaintiff to endorse his notes as an accommodation indorser, but testifies that he has paid two of them, and was ready to pay the other when presented, and had paid her $460 for the accommodation. He admits trying to induce her to go into the land business with him, and states that when she was unwilling and seemed to be

more interested in land, he tried to sell her the land in controversy. He claims that he read all the papers over to her, and that it was all satisfactory with her. He also denies that the plaintiff was in any way disqualified from transacting business on account of her visit to the corn doctor. In this he is corroborated by the notary public. This witness, among other things testified: "I could not repeat all that was said because we conversed quite a long time, but Mr. Wyman came into the office, and brought this lady, Mrs. Schinzer, and introduced her and stated that she wished to have acknowledgments taken and a couple of instruments. These instruments were presented and Mrs. Schinzer sat down at my desk and signed these instruments, and before signing I explained to her the nature of the instruments, that they were deeds covering certain land and made in favor of a certain party. She signed them and I put to her the usual question, whether she acknowledged their execution, and she replied in the affirmative, and Mrs. Miller was called in to witness the instruments. In the meantime conversation ensued in which either Mr. Wyman or Mrs. Schinzer mentioned the fact that she had purchased this,—a certain other farm out here at—I think I knew it as the Barry farm,—and there was considerable other talk about Mrs. Schinzer's personal experience, or affairs to some extent, the principle fact of which, that I remember most clearly, is the fact that she was farming in Illinois, and that she had made a deal for the purchase of the Barry farm at Mapleton. I don't think—in fact I am positive now—the details were not gone into as to the transaction. I don't think, and I am quite positive, none of the details of the conversation were gone into in any way, except we conversed back and forth for probably half an hour, on such a matter. I had not the least difficulty in conversing with Mrs. Schinzer as to her understanding English. She seemed to—I could clearly understand her and her statements. She appeared to be in good health. Q. And how did she—as to talking over business matters, did she answer intelligently and talk intelligently of her business matters? A Yes, I thought that she appeared to be exceptionally so for a lady transacting business. I remember most distinctly that either she or Mr. Wyman mentioned the fact that she had a farm in Illinois that had been left her by her husband; that is, it had belonged to the family of her husband, and her husband had died, and Mr. Schinzer didn't leave things in the very

best of shape, but she had been a very industrious and energetic woman, taken hold and managed the farm herself, and she related the fact, as I remember most distinctly, that she even went to the extent of driving teams and harnessing and taking care of her own horses; that she had made a great success of her management down there, and was now branching out." On the other hand, Mr. Lacy, the attorney for the plaintiff, testified: "I am one of the attorneys for the plaintiff in this action. The action was commenced about the 3d of July, 1911, and shortly after the action was commenced I had a conversation with Mr. Engebretson, the witness who just preceded me, and in that conversation I asked him in regard to,—I asked him if he took the acknowledgments of certain deeds of Mrs. Schinzer on the 12th day of June, 1911, and he told me he did, and I asked him if he knew anything about the transaction. He said he didn't know much about it. And I asked him if he knew—if he was certain as to whether or not Mrs. Schinzer knew what she was signing. He says, 'Well, as to the deeds, I think she did, because I looked upon the transaction as a suspicious one, and so I asked her if she knew what she was signing, and she said she did, and then I took her acknowledgments to the deeds.' " The making of these statements, however, was denied by Mr. Engebretson.

*Watson & Young* and *E. T. Conmy,* for appellant.

The one particular ground upon which plaintiff asks for cancelation in her complaint has been ignored, and the court has gone out of the issues to find independent grounds for the decree of cancelation entered. Such procedure requires a reversal of the judgment. Harkins v. Cooley, 5 S. D. 227, 58 N. W. 560; Couch v. State, 14 N. D. 361, 103 N. W. 942; Chaffee-Miller Land Co. v. Barber, 12 N. D. 478, 97 N. W. 850.

It is not the province of courts to make contracts for parties, nor to "undo a bargain because it is hard," nor to deprive a person of the fruits of a good bargain, in the absence of other sufficient reasons. Ruttland Marble Co. v. Ripley, 10 Wall. 339, 355, 19 L. ed. 955, 960, 3 Mor. Min. Rep. 291; Heyrock v. Surerus, 9 N. D. 28, 81 N. W. 36; Henniges v. Paschke, 9 N. D. 489, 81 Am. St. Rep. 588, 84 N. W. 350; 8 Cyc. 267, 268; Soberanes v. Soberanes, 97 Cal. 140, 31 Pac. 910.

Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. ed. 112; Maxwell Land-Grant Case, 121 U. S. 380, 30 L. ed. 958, 7 Sup. Ct. Rep. 1015; Ruttland Marble Co. v. Ripley, 10 Wall. 339, 354, 19 L. ed. 955, 960, 3 Mor. Min. Rep. 291; Veazie v. Williams, 8 How. 134, 157, 12 L. ed. 1018, 1028; Union R. Co. v. Dull, 124 U. S. 173, 183, 31 L. ed. 417, 421, 8 Sup. Ct. Rep. 433.

Fraud and misrepresentation must clearly appear. Maxwell Land-Grant Case, 121 U. S. 325, 30 L. ed. 949, 7 Sup. Ct. Rep. 1015; United States v. San Jacinto Tin Co. 125 U. S. 273, 300, 31 L. ed. 747, 756, 8 Sup. Ct. Rep. 850; Colorado Coal & I. Co. v. United States, 123 U. S. 307, 317, 31 L. ed. 182, 186, 8 Sup. Ct. Rep. 131; United States v. Hancock, 133 U. S. 193, 197, 33 L. ed. 601, 604, 10 Sup. Ct. Rep. 264.

To set aside a written contract, fraud or misrepresentation must be proved by clear, convincing, and unambiguous evidence. Jasper v. Hazen, 4 N. D. 6, 23 L.R.A. 58, 58 N. W. 454; Eames v. Hardin, 111 Ill. 634; Gassert v. Bogk, 7 Mont. 585, 1 L.R.A. 240, 19 Pac. 281, 149 U. S. 17, 37 L. ed. 631, 13 Sup. Ct. Rep. 738; Locke v. Moulton, 96 Cal. 21, 30 Pac. 957; Ensminger v. Ensminger, 75 Iowa, 89, 9 Am. St. Rep. 462, 39 N. W. 208; Howland v. Blake, 97 U. S. 624, 24 L. ed. 1027; Kent v. Lasley, 24 Wis. 654; McGuin v. Lee, 10 N. D. 160, 86 N. W. 714; Riley v. Riley, 9 N. D. 580, 84 N. W. 347; Wells v. Geyer, 12 N. D. 316, 96 N. W. 289; Carter v. Carter, 14 N. D. 66, 103 N. W. 425; Wadge v. Kittleson, 12 N. D. 452, 97 N. W. 856; Little v. Braun, 11 N. D. 410, 92 N. W. 800; Northwestern F. & M. Ins. Co. v. Lough, 13 N. D. 601, 102 N. W. 160; Heyrock v. Surerus, 9 N. D. 28, 81 N. W. 36; Chilson v. Houston, 9 N. D. 498, 84 N. W. 354; Liland v. Tweto, 19 N. D. 551, 125 N. W. 1032; Miller v. Smith, 20 N. D. 96, 126 N. W. 499; Anderson v. Anderson, 17 N. D. 275, 115 N. W. 836; Smith v. Jensen, 16 N. D. 408, 114 N. W. 306.

A complaint which charges that a party who was to prepare a written contract in pursuance of a previous oral agreement prepares one materially different, and by a trick or device has it signed, charges an actual fraud for which equity will give relief. 1 Pom. Eq. Jur. 877, note; Bethell v. Bethell, 92 Ind. 324; Harrington v. Brewer, 56 Mich.

301, 22 N. W. 813; 9 Enc. Pl. & Pr. 686–688, and cases cited; Bump, Fraud. Conv. 114, 193, § 28; Stevens v. Meyers, 14 N. D. 398, 104 N. W. 529; 2 Dan. Ch. Pl. & Pr. Perkins's ed. p. 992.

It is settled that the decree must conform to the allegations, as well as to the proofs, in the cause. 1 Dan. Ch. Pl. & Pr. Perkins's ed. p. 377; Story, Eq. Pl. 257; Crocket v. Lee, 7 Wheat. 522, 5 L. ed. 513; Jackson v. Ashton, 11 Pet. 229, 9 L. ed. 698; James v. M'Kernon, 6 Johns. 564; McCormick Harvesting Mach. Co. v. Rae, 9 N. D. 482, 84 N. W. 346; McClory v. Ricks, 11 N. D. 42, 88 N. W. 1043.

The findings and judgment must conform to the issues made by the pleading. Harkins v. Cooley, 5 S. D. 227, 58 N. W. 560; Winona v. Minnesota R. Constr. Co. 27 Minn. 427, 6 N. W. 795, 8 N. W. 148; Devoe v. Devoe, 51 Cal. 543; Gregory v. Nelson, 41 Cal. 278, 12 Mor. Min. Rep. 124; 9 Enc. Pl. & Pr. 684; 18 Enc. Pl. & Pr. 808.

The plaintiff cannot rely on other misrepresentations than those alleged in the bill. 6 Cyc. 333, 334; Touchstone v. Staggs, — Tex. Civ. App. —, 39 S. W. 189; Wren v. Moncure, 95 Va. 369, 28 S. E. 588.

A recovery will not be allowed upon a case, although proved, which differs essentially from that alleged in the bill. Smith v. Nicholas, 8 Leigh, 354; Brown v. Toell, 5 Rand. (Va.) 543, 16 Am. Dec. 759; Thompson v. Jackson, 3 Rand. (Va.) 504, 15 Am. Dec. 721; Hunter v. Jett, 4 Rand. (Va.) 104; Potomac Mfg. Co. v. Evans, 84 Va. 717, 6 S. E. 2; Crocket v. Lee, 7 Wheat. 522, 5 L. ed. 513; Dorr v. Pacific Ins. Co. 7 Wheat. 590, 5 L. ed. 531; Hoyt v. Hoyt, 27 N. J. Eq. 399, 28 N. J. Eq. 485.

Parties are confined to the issues made by their pleadings in this court, as much as in a court of law. Stafford v. Stafford, 1 N. J. Eq. 525; 1 Dan. Ch. Pl. & Pr. 328, 434 et seq.; Doughty v. Doughty, 7 N. J. Eq. 643; Pasman v. Montague, 30 N. J. Eq. 385; Montesquieu v. Sandys, 18 Ves. Jr. 302, 11 Revised Rep. 197; Snider v. Wilson, — Iowa, —, 78 N. W. 802; United States v. Des Moines Nav. & R. Co. 142 U. S. 510, 35 L. ed. 1099, 12 Sup. Ct. Rep. 308; Wait v. Kellogg, 63 Mich. 138, 30 N. W. 80, 18 Enc. Pl. & Pr. 899; Oliphant v. Liversidge, 142 Ill. 160, 30 N. E. 334; 1 Am. & Eng. Enc. Law, 2d ed. p. 560, and cases cited; Smith v. Allis, 52 Wis. 337, 9 N. W. 155; 1 Cyc. 619, 620, 623–626.

Fraud without damage is no ground for relief. Garrow v. Davis, 15

How. 272, 277, 14 L. ed. 692, 694; Smith v. Richards, 13 Pet. 26, 37, 10 L. ed. 42, 47; Marshall v. Hubbard, 117 U. S. 415, 417, 29 L. ed. 919, 6 Sup. Ct. Rep. 806; Angle v. Chicago, St. P. M. & O. R. Co. 151 U. S. 1, 10, 38 L. ed. 55, 59, 14 Sup. Ct. Rep. 240; Farnsworth v. Duffner, 142 U. S. 43, 55, 35 L. ed. 931, 936, 12 Sup. Ct. Rep. 164; Clarke v. White, 12 Pet. 178, 196, 9 L. ed. 1046, 1054; Conard v. Nicoll, 4 Pet. 291, 297, 7 L. ed. 862, 864; United States v. Arredondo, 6 Pet. 691, 716, 8 L. ed. 547, 556; 2 Pom. Eq. Jur. 898; 6 Cyc. 326; Bailey v. Fox, 78 Cal. 389, 20 Pac. 868; Morrison v. Lods, 39 Cal. 381; Marriner v. Dennison, 78 Cal. 202, 20 Pac. 386; Pasley v. Freeman, 3 T. R. 51, 2 Smith, Lead. Cas. 66, 1 Revised Rep. 634, 12 Eng. Rul. Cas. 235.

To rescind an executed contract for fraud, there must be damage as well as fraud, and this must clearly appear; and the decree must be according to the allegations, as well as to the proof. Primmer v. Patten, 32 Ill. 528; Wright v. Dame, 22 Pick. 55; McElwain v. Willis, 9 Wend. 548; McIntyre v. Trustees of Union College, 6 Paige, 239; Spence v. Duren, 3 Ala. 251; Danels v. Taggart, 1 Gill & J. 311; Edwards v. Massey, 8 N. C. (1 Hawks) 359; Lingan v. Henderson, 1 Bland, Ch. 236; Hood v. Inman, 4 Johns. Ch. 437; Edwards v. Chilton, 4 W. Va. 352; Crittenden v. Craig, 2 Bibb, 474; Cunningham v. Shields, 4 Hayw. (Tenn.) 44; Cotton v. Butterfield, 14 N. D. 473, 105 N. W. 236; Foster County Implement Co. v. Smith, 17 N. D. 178, 115 N. W. 663; Martinson v. Regan, 18 N. D. 472, 123 N. W. 285; Clapp v. Tower, 11 N. D. 556, 93 N. W. 862; Townshend v. Goodfellow, 40 Minn. 312, 3 L.R.A. 739, 12 Am. St. Rep. 736, 41 N. W. 1056.

*John P. Devine*, and *A. C. Lacy*, for respondent.

The term "fiduciary" involved the idea of trust, confidence; it refers to the integrity, the fidelity, of the party trusted. It contemplates good faith, rather than legal obligation. Stoll v. King, 8 How. Pr. 298; Thomas v. Whitney, 186 Ill. 225, 57 N. E. 808; Studybaker v. Cofield, 159 Mo. 596, 61 S. W. 246; Scattergood v. Kirk, 192 Pa. 263, 43 Atl. 1030.

"Confidential relations" is a term which includes all the variety of relations in which dominion may be exercised by one person over another. Harraway v. Harraway, 136 Ala. 499, 34 So. 836; Hetrick's

Appeal, 58 Pa. 477; Roby v. Colehour, 135 Ill. 300, 25 N. E. 778; 2 Pom. Eq. Jur. 956; Liland v. Tweto, 19 N. D. 551, 125 N. W. 1032.

A trustee *ex maleficio* arises whenever a person acquires the legal title of property by false and fraudulent promises to hold it for certain specified purposes. Ahrens v. Jones, 169 N. Y. 555, 88 Am. St. Rep. 620, 62 N. E. 666; Northern P. R. Co. v. Kindred, 3 McCrary, 627, 14 Fed. 77.

A confidential trust relation existed between plaintiff and defendant, and defendant violated his trust when he sought to encumber plaintiff's property for his own use. Towle v. Ambs, 123 Ill. 410, 14 N. E. 689; Robbins v. Butler, 24 Ill. 387; Pironi v. Corrigan, 47 N. J. Eq. 135, 20 Atl. 218; Shute v. Johnson, 25 Or. 59, 34 Pac. 965; Green v. Pesso, 92 Iowa, 261, 60 N. W. 531; Gould v. Gould, 36 Barb. 270; Gumpel v. Castagnetto, 97 Cal. 15, 31 Pac. 898; Carbine v. McCoy, 85 Ga. 185, 11 S. E. 651; Wood v. Evans, 43 Mo. App. 230.

Even though the transaction itself could not have been impeached if no such confidential relation had existed, still the person so availing himself of his position of trust will not be permitted to retain the advantage so fraudulently acquired. Cowee v. Cornell, 75 N. Y. 91, 31 Am. Rep. 434; Nesbit v. Lockman, 34 N. Y. 167; Story, Eq. Jur. 311; Sears v. Shafer, 6 N. Y. 268; Huguenin v. Baseley, 13 Ves. Jr. 105, 9 Revised Rep. 148, 276; Wright v. Proud, 13 Ves. Jr. 138; Harris v. Tremenheere, 15 Ves. Jr. 40, 10 Revised Rep. 5; Hugenin v. Baseley, 14 Ves. Jr. 273, 15 Ves. Jr. 180; Edwards v. Meyrick, 2 Hare, 60, 12 L. J. Ch. N. S. 49, 6 Jur. 924; Hunter v. Atkins, 3 Myl. & K. 113.

The minds of contracting parties must meet and assent to the same thing, in the same sense, and at the same moment of time, or there is no contract. Newlin v. Prevo, 90 Ill. App. 515; Peerless Glass Co. v. Pacific Crockery & Tinware Co. 121 Cal. 641, 54 Pac. 101; Wagner v. Egleston, 49 Mich. 218, 13 N. W. 522; Board of Trade v. De Bruyn, 138 Mich. 187, 101 N. W. 262; Green v. Cole, 103 Mo. 70, 15 S. W. 317; Sutter v. Raeder, 149 Mo. 297, 50 S. W. 813; Brophy v. Idaho Produce & Provision Co. 31 Mont. 279, 78 Pac. 493; Krum v. Chamberlain, 57 Neb. 220, 77 N. W. 665; McGavock v. Morton, 57 Neb. 385, 77 N. W. 785; Columbus, H. V. & T. R. Co. v. Caffney, 65 Ohio St. 104, 61 N. E. 152; Foshier v. Fetzer, 154 Iowa, 147, 134

N. W. 556; Jules Levy & Bro. v. A. Mautz & Co. 16 Cal. App. 666, 117 Pac. 936; Cunningham Mfg. Co. v. Rotograph Co. 30 App. D. C. 524, 15 L.R.A.(N.S.) 368, 11 Ann. Cas. 1147; Luckey v. St. Louis & S. F. R. Co. 133 Mo. App. 589, 113 S. W. 703; Miller v. Sharp, — Ind. App. —, 100 N. E. 108; Elks v. North State Ins. Co. 159 N. C. 619, 75 S. E. 808.

The entire contract, since only a part of it is in writing, will be deemed a parol contract. Miller v. Sharp, — Ind. App. —, 100 N. E. 108; Weber v. Lewis, 19 N. D. 473, 34 L.R.A.(N.S.) 364, 126 N. W. 105.

Power to sell does not give power to mortgage. Morris v. Ewing, 8 N. D. 99, 76 N. W. 1047.

A party cannot sit by and permit an incompetent or improper question to be asked without objection, and, when he discovers the answer is against him, move to strike out the answer. Hogen v. Klabo, 13 N. D. 319, 100 N. W. 847; State v. Pirkey, 22 S. D. 550, 118 N. W. 1042, 18 Ann. Cas. 192; State v. Dahlquist, 17 N. D. 40, 115 N. W. 81.

The assumption is that evidence offered without objection is made competent by agreement of counsel, or is deemed competent, and the attention of the trial court not having been called to it, it comes too late to first raise such question on appeal. Davis v. Mills, — Tex. Civ. App. —, 133 S. W. 1064; Belber Truck & Bag Co. v. Silberblatt, 44 Pa. Super. Ct. 32; H. C. Behrens Lumber Co. v. Lager, 26 S. D. 160, 128 N. W. 698, Ann. Cas. 1913A, 1128; Weik v. Pugh, 92 Ind. 382; Stanley v. Sutherland, 54 Ind. 339; State v. Eisenhour, 132 Mo. 140, 33 S. W. 785; Buchanan v. Minneapolis Threshing Mach. Co. 17 N. D. 343, 116 N. W. 335; State v. Dahlquist, 17 N. D. 40, 115 N. W. 81.

In an action tried without reference to the pleadings, when no evidence is objected to as incompetent, the court should determine on all the evidence given and so receive, without reference to the pleadings. Barcus v. Dorries, 64 App. Div. 109, 71 N. Y. Supp. 695; Alabama Steel & Wire Co. v. Symons, 110 Mo. App. 41, 83 S. W. 78; Tubular Rivet & Stud Co. v. Exeter Boot & Shoe Co. 86 C. C. A. 648, 159 Fed. 824; Cumberledge v. Brooks, 235 Ill. 249, 85 N. E. 197; Sample v. Chicago, B. & Q. R. Co. 233 Ill. 564, 84 N. E. 643; Chicago, B. & Q. R. Co. v. Sample, 138 Ill. App. 95; Leigh v. National Hollow Brake Beam Co. 131 Ill. App. 106; Helmbacher Forge & Rolling Mills Co.

v. Bartels, 133 Ill. App. 22; Von Trebra v. Laclede Gaslight Co. 209 Mo. 648, 108 S. W. 559; Devlin v. Charleston & W. C. R. Co. 79 S. C. 469, 60 S. E. 1123; Ragsdale v. Illinois C. R. Co. 236 Ill. 175, 86 N. E. 214; Western U. Teleg. Co. v. Buchanan, — Tex. Civ. App. —, 129 S. W. 850; Gascoigne v. Metropolitan West Side Elev. R. Co. 239 Ill. 18, 87 N. E. 883, 16 Ann. Cas. 115.

A motion grounded in an alleged variance does not preserve the consideration of such variance as a question of law for review by this court, in the absence of an objection, or a motion to exclude. Johnson v. Gary, 18 Idaho, 623, 111 Pac. 855, 1 N. C. C. A. 800; Aulbach v. Dahler, 4 Idaho, 654, 43 Pac. 322; Bell v. Knowles, 45 Cal. 193; Thompson-Starrett Co. v. Fitzgerald, 79 C. C. A. 427, 149 Fed. 721; Chicago & E. I. R. Co. v. Snedaker, 223 Ill. 395, 79 N. E. 169; Landt v. McCullough, 121 Ill. App. 328; Beverley v. Boston Elev. R. Co. 194 Mass. 450, 80 N. E. 507; Gaume v. Horgan, 122 Mo. App. 700, 99 S. W. 457; Bird v. Gustin-Boyer Supply Co. 123 Mo. App. 36, 99 S. W. 775; Petersen v. Elholm, 130 Wis. 1, 109 N. W. 76, 1034.

Further than this, defendant tendered evidence to meet the evidence he now says was objectionable. Taliaferro v. Shepherd, 107 Va. 56, 57 S. E. 585; Illinois C. R. Co. v. Heath, 228 Ill. 312, 81 N. E. 1022; Davis v. Illinois Collieries Co. 232 Ill. 284, 83 N. E. 836; Continental Casualty Co. v. Maxwell, 127 Ill. App. 19; Taylor v. Southerland, 7 Ind. Terr. 666, 104 S. W. 874; Hammond v. Porter, 150 Mich. 328, 114 N. W. 64.

There was no affidavit filed stating that defendant had been misled to his prejudice by an alleged variance, and such variance is not available on appeal. Farmers' Bank v. Manchester Assur. Co. 106 Mo. App. 114, 80 S. W. 299.

Sufficiency of a pleading to present a certain issue, cannot be urged on appeal where the parties tried such issue in the lower court, without objection. Ashe v. Beasley, 6 N. D. 191, 69 N. W. 188; Cargnani v. Cargnani, 16 Cal. App. 96, 116 Pac. 306; Buchanan v. Minneapolis Threshing Mach. Co. 17 N. D. 343, 116 N. W. 335; California Portland Cement Co. v. Wentworth Hotel Co. 16 Cal. App. 692, 118 Pac. 103, 113; Stilwell v. Carpenter, 62 N. Y. 639, 2 Abb. N. C. 238; Eastwood v. Relsof Min. Co. 86 Hun, 91, 34 N. Y. Supp. 196; Guley v. Northwestern Coal & Transp. Co. 7 Wash. 491, 35 Pac. 372;

Thomas v. Black, 84 Cal. 221, 23 Pac. 1037; More v. Burger, 15 N. D. 345, 107 N. W. 200; Scott v. Scott, 83 Conn. 634, 78 Atl. 314, 21 Ann. Cas. 965; Halloran v. Holmes, 13 N. D. 411, 101 N. W. 310; Anderson v. First Nat. Bank, 5 N. D. 80, 64 N. W. 114; Geanakoules v. Union Portland Cement Co. 41 Utah, 486, 126 Pac. 329; O'Brien v. Northwestern Consol. Mill. Co. 119 Minn. 4, 137 N. W. 399; Catlin v. Gunter, 11 N. Y. 368, 62 Am. Dec. 113; Place v. Minster, 65 N. Y. 89; Burt v. C. Gotzian & Co. 43 C. C. A. 59, 102 Fed. 937.

The variance must be specifically pointed out. Probst Constr. Co. v. Foley, 166 Ill. 31, 46 N. E. 750; Joliet v. Johnson, 177 Ill. 178, 52 N. E. 498; Zellers v. White, 208 Ill. 518, 100 Am. St. Rep. 243, 70 N. E. 669; Gascoigne v. Metropolitan West Side Elev. R. Co. 239 Ill. 18, 87 N. E. 883, 16 Ann. Cas. 115; DeLaney v. Western Stock Co. 19 N. D. 630, 125 N. W. 499; Galvin v. O'Gorman, 40 Mont. 391, 106 Pac. 887; Gilson v. Hays, 2 Kan. App. 460, 43 Pac. 93.

If matters which should have been pleaded are admitted by counsel to be given in evidence, they will have the same effect as though pleaded. Jackson ex dem. Lathrop v. Demont, 9 Johns. 55, 6 Am. Dec. 259; Thomas v. Black, 84 Cal. 221, 23 Pac. 1037; National State Bank v. Boesch, 90 Iowa, 47, 57 N. W. 641; Hollenback v. Stone & W. Engineering Corp. 46 Mont. 559, 129 Pac. 1058; Ward v. Brown, 31 S. D. 296, 140 N. W. 698; Fidelity & D. Co. v. Hibbler, — Mich. —, 143 N. W. 604; Dickinson v. White, 25 N. D. 523, 49 L.R.A.(N.S.) 362, 143 N. W. 754.

A suit to set aside conveyance of an agent under power of attorney constitutes a revocation of such power of attorney. Hatch v. Ferguson, 14 C. C. A. 41, 29 U. S. App. 540, 66 Fed. 668.

Authority to sell lands, unless otherwise expressly provided, is authority only to sell for cash on delivery of deed. Marble v. Bang, 54 Minn. 277, 55 N. W. 1131; Hall v. Storrs, 7 Wis. 253; Persons v. Smith, 12 N. D. 403, 97 N. W. 551; Raymond v. Edelbrock, 15 N. D. 231, 107 N. W. 194; Larmon v. Knight, 140 Ill. 232, 33 Am. St. Rep. 229, 29 N. E. 1116, 30 N. E. 318; Towle v. Ambs, 123 Ill. 410, 14 N. E. 689; Potter v. Couch, 141 U. S. 321, 35 L. ed. 734, 11 Sup. Ct. Rep. 1005; Nester v. Gross, 66 Minn. 371, 69 N. W. 39; 2 Pom. Eq. Jur. 1053.

Courts of equity do not lend themselves as agents to perpetuate fraud and robbery, or to assist parties in retaining the proceeds. Reddin v. Dunn, 2 Colo. App. 518, 31 Pac. 947; Oard v. Oard, 59 Ill. 47; Frazier v. Miller, 16 Ill. 49; Jones v. Neely, 72 Ill. 449; Brannan v. Strauss, 75 Ill. 235; White v. White, 89 Ill. 461.

BRUCE, J. (after stating the facts as above). It is impossible to sustain the judgment of the trial court, under the pleadings and the evidence in this case.

The case presented by the pleadings is one of fraud and of a successful attempt to induce the plaintiff to sign two warranty deeds and a contract of purchase, when she merely thought she was executing, and merely intended to execute, a permission to the defendant to sell certain real estate as her agent.

The trial court, however, decided the case and found the issues for the plaintiff as if the issues presented by the pleadings had been the obtaining of the deeds and the contract of purchase by undue influence, and also bases his conclusion quite largely upon the assumption that the plaintiff thought she was signing an option, rather than a contract, to purchase. These findings are irreconcilable, and no foundation for them is laid in the pleadings.

The trial court, indeed, decided the case upon points which were not raised or relied upon by the plaintiff, and which probably never occurred either to her or her attorney until after the tentative opinion was prepared. We cannot find any evidence, and the trial court did not find any proof, of any substitution of documents, or of the perpetration of any direct fraud at the time of the execution of the deeds and contract in question.

To our minds all the evidence in regard to the undue influence, if any, was inadmissible, except as tending to show a preconcerted scheme leading up to the fraud alleged, and this fraud was not proved.

The allegations as to undue influence, indeed, are, as we read the complaint, merely pleaded by way of inducement, while the real gist of the complaint is fraud. There is, as we have before stated, really nothing in the evidence to sustain the allegations of the complaint. The plaintiff herself admits that she executed some papers; that a part of the contract relating to the $75,000 transaction was read to her. On

the morning that she executed the contract and the deeds she told defendant's wife that she had purchased the land, and after arriving home she wrote to her to the same effect. She executed and acknowledged the deeds before a notary public, and he testifies positively that he read them over and explained them to her; that she signed at his desk in his office; that he asked her whether she signed them voluntarily, and she answered that she did. He testifies that she appeared to be in good health at the time, and that she impressed him as being an intelligent woman in business affairs. He also testified that it was stated, either by her or by the defendant, in his presence, that she was buying the Barry farm. This testimony is not disputed, and there is absolutely nothing in the record to show fraud or to sustain the charge in the complaint that the defendant induced the plaintiff to sign a contract for purchase and deeds when she thought she was merely signing a permission to sell. The testimony in regard to her ill health is inconclusive. All that is shown is that she had a corn or some other growth on her foot, and that, while having it treated, she fainted. There is no proof whatever that at the time she acknowledged and executed the instruments she was not in the full possession of her faculties. Much less credit can be given to the attempt to show that on the night before the execution of the deeds and contract the defendant made her intoxicated, or overcame her judgment by the use of liquor. She was a German by descent, and the evidence shows that she had drank beer on previous occasions. All the liquor that she drank on the particular occasion was half a glass of beer. This was drunk on Sunday night. The deeds were executed towards noon on Monday morning. Before going down town on Monday morning she told Mrs. Wyman that she had bought the Barry farm. She does not for a moment say that she was intoxicated or overcome by the use of the liquor. Even if she had been, and we gave to half a glass of beer potentialities which no sane man would believe it to possess, it is beyond reason to suppose that the influence of the half glass extended over night and up to the following noon. It is by no means proved that the land was not worth what she agreed to pay for it. It might have been unwise for the plaintiff to buy it, but a court cannot arbitrarily undo solemn contracts merely because their entering into may have been unwise. Ruttland Marble Co. v. Ripley, 10 Wall. 339, 355,

19 L. ed. 955, 960, 3 Mor. Min. Rep. 291; Heyrock v. Surerus, 9 N. D. 28, 81 N. W. 36; Soberanes v. Soberanes, 97 Cal. 140, 31 Pac. 910; 6 Cyc. 267, 268. "Canceling an executed contract," says the Supreme Court of the United States in Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. ed. 112, "is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured by them." See also Maxwell Land-Grant Case, 121 U. S. 380, 30 L. ed. 958, 7 Sup. Ct. Rep. 1015; Veazie v. Williams, 8 How. 134, 157, 12 L. ed. 1018, 1028; Union R. Co. v. Dull, 124 U. S. 173, 183, 31 L. ed. 417, 421, 8 Sup. Ct. Rep. 433; United States v. San Jacinto Tin Co. 125 U. S. 273, 300, 31 L. ed. 747, 756, 8 Sup. Ct. Rep. 850; Colorado Coal & I. Co. v. United States, 123 U. S. 307, 317, 31 L. ed. 182, 186, 8 Sup. Ct. Rep. 131; United States v. Hancock, 133 U. S. 193, 197, 33 L. ed. 601, 604, 10 Sup. Ct. Rep. 264; Jasper v. Hazen, 4 N. D. 1, 6, 23 L.R.A. 58, 58 N. W. 454; McGuin v. Lee, 10 N. D. 160, 86 N. W. 714; Riley v. Riley, 9 N. D. 580, 84 N. W. 347; Carter v. Carter, 14 N. D. 66, 103 N. W. 425; Wadge v. Kittleson, 12 N. D. 452, 97 N. W. 856; Little v. Braun, 11 N. D. 410, 92 N. W. 800; Northwestern F. & M. Ins. Co. v. Lough, 13 N. D. 601, 102 N. W. 160; Heyrock v. Surerus, 9 N. D. 28, 81 N. W. 36; Miller v. Smith, 20 N. D. 96, 126 N. W. 499; Anderson v. Anderson, 17 N. D. 275, 115 N. W. 836.

Even if undue influence were an issue in the case, we are hardly able to find it from the evidence. The plaintiff was not a grossly ignorant woman. She appears to have been able to accumulate quite a little property, and to have been able to manage her real estate with a good deal of success. The evidence in regard to her pain and suffering is entirely inconclusive. It is a noticeable fact that after signing the papers she took a pleasure trip in an automobile to Detroit. If she fainted at all it was merely in the doctor's office pending a slight operation on her foot, which does not seem to have prevented her going to Detroit or from leaving for Illinois the next day. The letters written to Mr. and Mrs. Wyman immediately after her return to Illinois show clearly that she understood that she had agreed to purchase the

27 N. D.—33.

land.   One letter at least was written before she had consulted her lawyer or anyone else, and she must have learned the facts therein disclosed, either from a perusal of the documents or from the statements of the defendant.   The evidence, indeed, seems to conclusively point to the fact that she did not think of repudiating the transaction until influenced by her friends and family in Illinois, who seemed to have been unwilling that she should leave that state.   If there was undue influence in this case, there is undue influence in almost every transaction in the business world.   There is hardly a sale, whether of merchandise in a store, of a book in an office, or of a piece of land, or of farm machinery, in which the seller does not extol his goods and seek to overcome the objections of the purchaser in regard to the greatness of the cost or the extravagance of the investment.   It is true that in this case the plaintiff was a woman, but she was a business woman.   Women in these modern days have been released from bondage, and have been placed upon a business and intellectual equality with men.   They can hold separate property, they can enter into partnerships, and they can make their own contracts.   To hold the plaintiff's contract in this case null and void would be to hold that no contract made by a woman has any binding force or validity, but can be set aside on the merest pretext, and be the subject of future litigation. Such a holding would take from woman the very advantages which the statute has given to her.   What she has been asking for has been an opportunity to stand for herself and to exercise her own judgment and personal freedom.   If we practically invalidate her contracts, and make them like those of a child, voidable at her option, we will simply preclude the making of contracts altogether, for no person will deal with her on any such a basis.   We cannot place adult women in the same category as infants, idiots, and insane persons.

We can hardly hold from the evidence that the contract was absolutely unreasonable or inequitable, or that it was not, except for the magnitude of the purchase, such a one as is not every day made in real estate circles.   Mrs. Schinzer agreed to purchase the two sections of land for $75,000.   There is no proof or claim that this was an exorbitant price.   Mr. Wyman agreed to himself purchase the land for $64,000, which he did, the difference being in the neighborhood of $8.50 an acre.   He agreed with Mr. Barry to take a $35,000 mortgage

upon the land as part of the purchase price, at an annual interest of 6 per cent. This agreement was assignable. He sold the Glyndon land and the Argusville land for $29,400, and for about what the joint value of the farms was estimated to be. In addition to this, Mrs. Schinzer was credited the proceeds of the 1911 crops, which amounted to $1,782. The transaction then would have allowed Mrs. Schinzer to keep her Illinois farm unencumbered, and to acquire the two sections of valuable land in North Dakota, providing that she gave a $35,000 mortgage on the North Dakota land, and provided in some way for the payment of the $11,000 to the defendant, Wyman, which she could do by a second mortgage, or by mortgaging her Illinois land. If she chose not to do this, but was satisfied with retaining her purchase in North Dakota alone, which would be a reasonable proceeding, as the farm was not merely in close proximity to the village of Mapleton, but within 11 miles of Fargo and she could have educated her son at either place, she could have sold her Illinois land. If she had done this for $200 an acre, she would have had enough to pay all the obligations on the North Dakota land, and would have had 1,280 acres of land situated in the best section of the Red River Valley, practically free and clear from all encumbrances. If she had sold the Illinois land for $150 an acre, she would only have had to assume a $10,000 mortgage, or a mortgage of about $8.50 an acre on the North Dakota land, in order to handle the deal. Instead of having the care and responsibility of three farms in three states, she would have had one large farm in one state.

So, too, there is no proof that the land purchased was not worth the price which was agreed to be paid. The case merely appears to be one where a person has made a binding contract, but has later been persuaded by her relatives and friends that it would have been better if she had not made it. There are few of us who, after we have made a business deal, do not wonder if we were wise in doing so. There are few of us who do not have friends who tell us that we have been foolish. These things, however, do not justify the setting aside of solemn contracts which are entered into under all of the formalities of the law. If they did, real-estate titles would be of but little value, and there would be no security in the business world. Ingwaldson v. Skrivseth, 7 N. D. 388, 75 N. W. 772.

It is not necessary for us to here consider the right of the defendant Wyman to mortgage the lands in question. The deeds and contract are not sought to be set aside on this ground. There is to be found in the pleadings no claim of a breach of condition or consideration, nor any prayer that the contract and deeds may be set aside on those grounds. The case presented by the pleadings, indeed, is merely a case of fraud and of a successful attempt to induce the plaintiff to sign two warranty deeds and a contract of purchase, instead of a mere permission to sell.

The judgment of the District Court is reversed, with directions to dismiss the complaint. The costs and disbursements of the proceedings so far incurred are to be taxed against the plaintiff.

Since, however, the contract is still alive, and the defendant has stated in his testimony that he is ready, able, and willing to perform the same, and said defendant or his grantees have been in possession of the land in controversy since the commencement of the suit, the trial court will retain jurisdiction of the case to the end that an additional and supplemental complaint may be filed, that an accounting may be had, that if possible a specific performance of the contract may be obtained, and that the rights and equities of both parties may be protected.