[File No. 6808.]

WILLIAM ARTHUR CHARON, Appellant, v. LAWRENCE WINDINGLAND, Respondent.

(4 NW(2d) 645.)

Opinion filed February 28, 1942.    On Rehearing July 1, 1942.

*DePuy & DePuy* and *Harold King,* for appellant.

*Albert Lundberg,* for respondent.

MORRIS, J. On June 10, 1938, the plaintiff sold to the defendant upon a written contract a quarter section of land in Walsh County, North Dakota. This is an action in equity by which the vendor seeks to have the contract canceled. He alleges that the contract is inequitable, unjust, and unconscionable, that the vendor at the time of the sale was and ever since has been of feeble mind, weak understanding, of no business capacity and was not able to understand the nature and effect of the contract that he signed. He further alleges that the vendee knew of his mental incapacity and with the intent to take advantage thereof and with the intent to defraud the vendor, induced him to enter into the contract, which he executed by mistake and without knowledge of its effect.

The vendee admits the execution of the contract and denies all other allegations of the complaint. The trial court dismissed the action.

The contract provides that upon full performance of its terms and conditions the vendor will convey to the vendee the real estate therein described. The purchase price is $2,100 with no interest on deferred payments and is to be paid as follows: "The sum of $300.00 on or before the execution of this contract, the receipt whereof is hereby acknowledged. The balance to be paid as follows: All of the wheat harvested on said premises each and every year over and above seven (7) bu. per acre; the party of the second part retaining 7 bu. per acre of said wheat crop, and delivering all the wheat above 7 bu. per acre to the party of the first part, each and every year, at the stipulated price of One Dollar ($1.00) per bu., until the full amount of the purchase price is paid."

The contract requires the grain to be delivered in the elevator or on cars at Edinburg, North Dakota, or some point not more remote. The

vendee agrees to pay all taxes beginning with the year 1939 and further agrees to plant not less than 50 acres of wheat each year.

Both the vendor and vendee are farmers living in the same neighborhood. The vendor was about thirty-six years old when the contract was made. He is of limited education, having quit school during the fifth grade. The vendee was about twenty-four years old and went through the seventh grade in school. Both were unmarried. The vendor lived near the land in question with his mother on what was known as the "home quarter," which his mother owned. His brother, Thomas Charon, lived about one-half mile away and frequently visited the vendor and his mother. Within a year prior to selling the land to the vendee, the vendor had been offered $2,100 cash for the land by another neighbor. The vendor blames the failure to consummate that transaction upon the interference of his brother, Tom. About two weeks prior to the execution of the contract the vendor offered to sell the land to the vendee for $2,100 cash. He was unable to raise the cash and thereupon offered to buy the land upon the terms contained in the contract. The discussion of the transaction took place at the vendor's home. The mother participated. The brother, Tom, was not advised of the pending sale. After some preliminary discussion, the vendor, his mother, and the vendee went to Edinburg where they procured the services of one Ordahl in drawing the contract. Ordahl had been a business man in Edinburg for many years. The vendee did most of the talking. Ordahl says that he wrote down what was recited to him and incorporated the terms into the contract. He then gave each party a copy of the contract. They asked him to read it, which he did, from beginning to end. Concerning the mental capacity of the vendor, he testified, "Yes, I knew he wasn't exactly so very bright." Upon being further questioned as to whether he regarded the vendor as incompetent to handle his own affairs, Ordahl said, "No, I don't think he was that bad." With regard to the vendor's mother, Ordahl was asked, "Did you look upon her as a shrewd business woman?" To which he replied, "Yes, quite competent." He further testified that as far as he could judge the parties fully understood the contract when they signed it.

The vendor had received the land in question as a gift from his father some years before. He farmed it most of the time himself. One year

he rented it to his brother, Tom. There were about 125 acres of tillable land on the quarter section. There were also considerable quack grass on it. Testimony as to the average production of wheat per acre in that vicinity varies from 8 bu. to 12 bu. per acre. The cash payment of $300 was paid at the time of the execution of the contract. This money was used by the vendor in paying past-due taxes on the land of mother and son.

The vendor was not strong physically. He had had many illnesses including pneumonia and typhoid fever, as well as the usual children's diseases. It is apparent from the record that the vendor was not as keen mentally as the average person. His mother was about seventy-one years old. Her memory has failed somewhat, but otherwise she seems to have been regarded as a competent and able business woman. The negotiations which resulted in the contract were had in the presence of and participated in by the mother. She also accompanied the parties to the office of the scrivener who drew the contract. She and her son read the contract after they returned home. This occurred on June 10, 1938. No objection was made to the contract until the following October, when the vendor told the vendee that he thought $1 per bushel was too much for the wheat and stated that he wanted to cancel the contract.

The contract was regarded by Mr. Ordahl, who drew it, as "rather one-sided." This opinion seems to have resulted from the provision in the contract for credit thereon for wheat raised in excess of seven bushels per acre to be delivered to the vendor at the price of $1 per bushel. While the contract may be said to favor the vendee, it was not regarded by the trial court, nor do we regard it as unconscionable. The vendor and his mother had been trying to sell the land for some time. It had not proved profitable when operated by the son and they both testified that they needed money to pay debts, which the mother had incurred, and delinquent taxes.

Contracts of weak-minded persons when shown to have been induced by fraud will be set aside by courts of equity. Story states the general rule to be "that the acts and contracts of persons who are of weak under-standings, and who are thereby liable to imposition, will be held void in courts of equity if the nature of the act or contract justify the conclu-

sion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning, or artifice, or undue influence." Story's Equity Jurisprudence, 14th ed, § 337.

In an equitable action to set aside a deed on account of mental incapacity of the grantor, this court has said that "before the court will set aside a conveyance on the ground of mental incompetency of the grantor it is necessary to show that the grantor, at the time of the execution of the instrument, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction involved." Nordby v. Sagen, 64 ND 376, 252 NW 383. See also Meyer v. Russell, 55 ND 546, 214 NW 857; Meyer v. Schmidt, 135 Neb 850, 284 NW 337.

While a contract for the sale of land may not be considered an instrument of equal rank to a deed executed with the formalities prescribed by law, it is of sufficient dignity to require fraud in its execution to be clearly established before the contract will be overthrown. Schinzer v. Wyman, 27 ND 489, 146 NW 898. Weakness of intellect does not always deprive a party of the capacity to make such a contract. Contracts will not be declared void merely because the parties thereto are not on the same mental plane. The courts cannot measure the differences of business sagacity of parties who may buy and sell land. The law presumes that men are honest in their dealings and charge of actual fraud must be supported by proof of facts or circumstances that indicate deceitful practice or unfair dealing.

The vendor, while not as keen mentally as the vendee, had a reasonable capacity to transact business. The trial court, who heard the testimony and observed the vendor on the witness stand, incorporated in its findings of fact, this statement: "He was a farmer and worked and farmed both his own land and that of his mother. He had been farming for many years and carried on his business and making necessary purchases, as required, and attended to buying and selling grain and complied with the AAA Government allotment and apparently in ever(y) way carried on his farming business the same as other farmers in the vicinity and while he had but little schooling or education he was, in my opinion, No Man's Fool, and was perfectly capable of transacting

his ordinary business and entering into contracts and had sufficient intelligence to know the consequence of any such contracts. He was not an incompetent and, in my opinion, was not feeble-minded."

While this case is here for trial de novo we may not wholly disregard the findings of the trial court. Doyle v. Doyle, 52 ND 380, 202 NW 860. This court said: "On a trial de novo the findings of the trial court are not clothed with the same presumptions in their favor as in other cases. But, on the other hand, in such a case as this, we must take into consideration the fact that we have here but a cold and lifeless record. We are called upon to determine the mental capacity, the state of mind, the knowledge and intent of Ellen Doyle at the time she executed and delivered the deed. We have not the advantage of seeing her, of noting her demeanor, of hearing her voice; of the innumerable intangible indicia that are so valuable to a trial judge in determining questions of this character. The trial court had the advantage of all of these things and, breathing the air of the trial, he was in an immeasurably better position to find the real facts in the case. Therefore, notwithstanding that the case is here for trial de novo, we must give some appreciable weight to the determination of the trial court."

There is clearly no actual fraud disclosed by the record. It does not appear that the vendee coerced the vendor in any manner into making the contract. After the vendor had attempted to sell his land to another neighbor and the transaction had failed of consummation, the vendor was still looking for somebody to buy the farm from him. He and the vendee met while putting out a fire in a near-by hay meadow. They got to talking about the sale of the farm. It does not appear who brought up the subject first. Shortly thereafter the vendee went to the vendor's home. The mother was present. They all agreed that the price should be $2,100. The vendee said he would try to get the money with which to pay the purchase price. Some days later he stated that he could not get the money to pay cash. No agreement as to other terms was made at that time. Several more days elapsed; the vendor then went to the place where the vendee lived. He was not at home. His brother said that he would send the vendee down to see the vendor the next morning. This was about two weeks after the first conversation between the parties regarding the land. The next morning the vendee came to the vendor's

place and again said that he could not get the money. These facts all clearly appear from the testimony of the vendor. It also appears that the mother, her son, and the vendee went to Edinburg the same day where the contract was drawn and signed in the office of the witness, Ordahl. The vendor insists that he understood that the contract was to provide for payment in cash, however, he also says that after the contract was drawn up and before he signed it that he and the vendee had an argument about whether a dollar was a fair price for the wheat.

The mother remembers little of the conversations that led up to the execution of the contract, but she remembers that the vendee came to her house at least twice to talk about buying the land and that she went with the parties to Mr. Ordahl's office and was present when the contract was signed and $300 cash paid by the vendee. The vendee testified that there was no discussion of the price of wheat in Edinburg, but that at the vendor's home the parties to the contract and the vendor's mother discussed the price and it was agreed upon at $1.

From this testimony it appears that the vendor wanted to sell his farm. This desire was shared by his mother. One deal for a sale had failed of consummation. The vendee agreed to pay $2,100 for the land if he could get the money. He tried but was unable to get it. The parties then entered into the contract that is now sought to be canceled. Apparently the mother participated in all negotiations. There is no evidence of any persuasion on the part of the vendee. The transaction seems to have been wholly voluntary on the part of everyone connected with it.

The allegations of the complaint with respect to fraud are meager and in fact, amounts to little more than legal conclusions. Nevertheless, we have treated them as sufficient, as did the trial court. Intermingled with the allegations of fraud is the further statement "said contract was executed by plaintiff by mistake and without knowledge of its effect." No attempt is made to set forth the facts or law concerning which the vendor claims to have been mistaken. The record discloses no evidence of mistake of such a nature that would entitle the vendor to cancel the contract. If there was a mistake it was not due to the vendor's failure to understand the contract, but was a mistake of judgment uninduced by any misrepresentation on the part of the vendee. No fiduciary or

confidential relationship existed between the parties. They were dealing with each other as strangers. The contract was not entered into hurriedly. It may have been more favorable to the vendee than to the vendor, but the consideration to be received by the vendor cannot be said to be unreasonably inadequate. The vendor has not shown himself to be so weak mentally as not to be able to comprehend the nature and effect of the transaction.

The vendor alleges that it was error for the court to sustain objections to questions propounded to witnesses concerning his ability and mental capacity to understand the terms of the contract in question or its nature and effect, and cites 20 Am Jur 717, Evidence, as an authority for the rule that nonexpert opinions may be given in cases involving questions of mental capacity to contract. The fault is not with the rule but with the application sought to be made. The questions deal not with the general mental capacity of the vendor, but seek the opinions of the witnesses as to his capacity to enter into the specific contract before the court. The questions invited answers that would invade the province of the court and call for legal conclusions. The point is well illustrated by the following statement from Atwood v. Atwood, 84 Conn 169, 79 A 59, 37 LRA(NS) 591.

"Two witnesses were permitted to testify, over the defendant's objection, that during the period of her illness Mrs. Atwood was not capable of doing business or making any contract or agreement. We think this evidence, under the circumstances of this case, was admissible as an opinion as to her general mental condition and the degree of her mental incapacity. If a question of this character called for a legal conclusion as to the capacity of one to make a particular will or a deed or a contract, it would be objectionable."

The vendor is also aggrieved because the trial court admitted in evidence a contract containing provisions similar to the one in question and executed by strangers to this lawsuit. We agree that the evidence thus admitted is irrelevant. This being a trial de novo, we have disregarded it. We, nevertheless, reach the same conclusions as did the trial court. The decision of the District Court must be affirmed.

BURKE, NUESSLE, and CHRISTIANSON, JJ., concur.

BURR, Ch. J. (dissenting). I dissent without setting forth my view of the evidence. I believe the record shows the contract should be canceled.

MORRIS, J. A rehearing was granted and the whole case has been reargued.

It was strenuously contended that the trial court erred in denying plaintiff's motion to reopen the case and submit testimony of an expert witness as to the plaintiff's mental capacity. This motion was made over a month and one-half after the trial had been completed. In a memorandum decision concerning this motion, the trial court states: "Now this case had been running along, tried at different times piecemeal and the parties finally rested and after the case was closed this application was made to produce this so-called expert witness on the mentality of the plaintiff. This witness resides in the city of Grafton and the plaintiff had plenty of opportunity to produce him at the hearing at different times when the evidence was taken but they failed to do so. . . ."

Trial courts are vested with broad discretion in permitting parties to reopen a case after resting and an appellate court will not interfere with the trial court's ruling except in case of a clear abuse of discretion. Fried v. Olsen, 22 ND 381, 133 NW 1041; Minneapolis Threshing Mach. Co. v. Huncovsky, 52 ND 112, 202 NW 280; In Re Canterbury, 224 Iowa 1080, 278 NW 210. In this case there was no abuse of discretion in denying plaintiff's motion.

After reviewing the record and reconsidering contentions of counsel, we adhere to our former decision.

BURR, Ch. J. (dissenting). I dissent. The sole issue is the capacity of the plaintiff. Plaintiff's education is limited. He went to school for three years, cannot read, and for writing can write his name only, though he claims to have gone through the fifth grade. He cannot figure interest, cannot even tell how much seven times six is. He has transacted simple and ordinary business matters. He sold wheat to the elevator, indorsed the check, and counted his money, for neither the bank nor the elevator company was seeking to take advantage of him. That is a fair deduction, it seems to me.

To my mind, the best test is the contract itself in the light of the circumstances under which it was made, for a court of equity will protect a weak-minded man where the purchase price is shown to be unconscionable.

Plaintiff lived with his mother on her land. She was worried over taxes on both farms, and this was the thought uppermost in her mind—how to get money to pay the taxes. A neighbor, Lars Almen, offered plaintiff $2,000 for his land, and raised the offer to $2,100 in the latter part of May, 1938, after some crop was put in. The record shows no withdrawal of this offer by Almen. He said it was immaterial to him whether the offer was taken or refused, though plaintiff says Almen "backed out." There is nothing to show he could not have gone to Almen when this contract was made and got the cash.

Almost immediately thereafter, the negotiations leading up to this contract began. Following defendant's version in the main, we learn defendant took plaintiff and his mother to the office of Mr. Ordahl, where the contract was executed on June 10, 1938. Mr. Ordahl says that plaintiff took no part in the conversation, but that his mother said they were anxious to get money to pay the taxes. There were back taxes on her land and on the land involved. "The talking" was done by the defendant, who stated the terms of the contract, and Ordahl wrote them down. Ordahl felt the terms were unfair, but said nothing, not even to explain them. He felt it was none of his business. He gave each a copy, and read the contract to them before it was signed. .

Defendant knew of the Almen offer and that plaintiff had been advised by his brother not to sell for $2,100 cash. Defendant's first offer was to pay $2,100 cash, but he could not raise the money.. Yet two weeks after the Almen offer, defendant suggests this wheat contract and plaintiff sells this land and the growing crop for the cash price offered by Almen, with a down payment of but $300, and gives the possession of the land to defendant upon his agreement that each subsequent year he would pay the taxes, and seed fifty acres to wheat. He could seed more to wheat if he cared, but need not do so, and in the succeeding years he did not. Defendant kept the 1938 crop for himself, as the price of $2,100 was for the land and the crop. He paid $100 for the crop, sold 98 bushels of wheat for 54c per bushel, the yield from

ten acres of clover for $30, and he had 18 acres of oats, yield not being given. Defendant could seed the remainder of the land to oats, flax, barley, potatoes, or anything else he saw fit, and keep all the returns from these crops; and he did.

The defendant was to keep the first 7 bushels per acre of wheat on all wheat acreage for himself, and to deliver to the plaintiff the remainder of the wheat. Plaintiff could not demand more. This wheat was to be taken by the plaintiff "at the stipulated price of one dollar ($1) per bu., until the full amount of the purchase price is paid." Defendant says, "I suggested it was an average price." The contract states specifically defendant is not to pay interest. He has the option to deliver in any year more wheat than the excess of 7 bushels per acre, and if he does so, this must be accepted by the plaintiff at $1 per bushel, no matter how poor may be the quality of the wheat. There is no grade stated, no minimum quality required. It may be frosted, blighted, mere chicken feed.

Plaintiff's version varies somewhat. He says the defendant came to him, told him he had as much money as Almen, and more, and he wanted to buy the land. When he came at another time, he wanted plaintiff to go to Edinburg and make a contract. Plaintiff says he suggested going to a lawyer, and when defendant objected to the one named, he mentioned another lawyer, and defendant then said it would cost too much. He says defendant never told him anything about the terms of the contract; he never knew what the terms were to be until he got to Edinburg, and that the defendant told him when he made out the contract he was paying him $300 down and would pay the balance in cash in the fall. He says he, plaintiff, made no statements as to what should go into the contract, and when defendant told him "7 bushels here and 7 bushels there, I didn't understand it." He says further this was the first time 7 bushels were mentioned. He does admit that when Ordahl asked him how many acres of wheat were to be seeded, he told him 50, but he was thinking about the allotment at that time. He says he understood that the back taxes were to be paid by the defendant; and in many other ways he and his mother contradict the statements made by the defendant as to the origin and the terms of the contract. On cross-

examination of plaintiff, there were some variations, but in the main these statements have followed the plaintiff's testimony.

The record shows that for the years 1938, 1939, and 1940, the wheat crop on this land averaged 7 bushels per acre—for 1938 being less than 5 bushels. At that average, plaintiff would never get anything further for his land. The average price was 55¢ per bushel. At that rate, plaintiff would get $1,290 for his farm instead of $2,100.

The card for No. 1 Northern weighing 60 lbs. to the bushel, shows the price from July, 1937, to June 29, 1938, ran from $1.36 (July 8, 1937) to 67¢ (June 2, 1938). The contract was executed June 10, 1938, when No. 1 Northern wheat was 74¢ per bushel.

The record shows that the crop average for this and neighboring land was fixed by the A. A. A. at 8.4 bushels per acre. At that average, plaintiff would get 70 bushels per year on 50 acres, and at $1 per bushel it would be twenty-six years before the purchase price would be paid, and no interest interim.

As further illustration, the record shows that in 1939 the 50 acres sowed produced 390 bushels of wheat of No. 2 dark wheat, and plaintiff got 40 bushels, which he had to credit at $1 per bushel, while the current price for that year was but 55¢. Defendant says the wheat grown was poor wheat. That year defendant had 35 acres of potatoes for himself, averaging, he said, about 78 bushels per acre (one time he said 60 to 70) on which he realized about 35¢ per bushel, or about $930 gross.

The crop of 1940 was somewhat better; on 50 to 51 acres, there were about 666 bushels and the price was 54¢ per bushel. The plaintiff would get $135 for the wheat, but had to credit $250 on the contract. However, the defendant for himself in addition to his 7 bushels of wheat to the acre, had 20 acres of barley averaging 15 bushels, and 40 acres of fair potatoes not dug in September. He says he delivered plaintiff's wheat from the 1940 crop in an elevator without direction from plaintiff, never asked him where it should be placed, nor notified plaintiff where he put it.

If the price of wheat rises above $1 per bushel, the defendant need not deliver anything but the surplus over 7 bushels. If the price falls

below $1 per bushel, he has the right to deliver all of the wheat raised, even if only hog feed. Thus, if the price fell to 25¢ a bushel, as it has done within recent times, the plaintiff would have to accept it at $1 per bushel.

It is significant defendant always sowed just the minimum acreage of wheat, and if it be argued this was in conformity with Federal allotment, let us recall that defendant knew this when he limited payments to wheat receipts on 50 acres. True, the present war inflation may raise the price of wheat so as to net plaintiff $1 per bushel, if he gets any at all, but surely no one contemplated such condition when the contract was drawn, and it is below the dollar today.

Here is a weak-minded man whose mother, worrying over unpaid taxes, wanted $300. He ignores a cash offer and immediately thereafter executes such a contract as has been set forth; and the court finds there is nothing therein to show the plaintiff was not competent and normal. In support of that finding, the court points to the fact that the distinguished Professor Brannon, former dean of our State University, sometime President of Beloit College, President of the University of Idaho, and Chancellor of Education in Montana, sold a quarter section of land in 1933, the land being some twenty-four miles north and twelve miles west of the land involved here, for 2,000 bushels durum or hard wheat, to be paid out of a surplus of over 7 bushels per acre, at least 70 acres per year to be sown to wheat; and because this talented and intelligent gentlemen, living at that time in Lewistown, Idaho, was willing to thus dispose of distant land in time of great depression, the contract entered into by this plaintiff cannot be construed as being the product of a weak mind. Defendant admits the Brannon contract was the one he had in mind when he suggested the wheat contract to the plaintiff and had Ordahl draw the same kind of a contract. We must not overlook the fact that the purchase price here was $2,100 in money. The Brannon price was 2,000 bushels of durum or hard wheat, and care was taken to protect Brannon in case his vendee furnished wheat from other lands. Each party to the Brannon contract was on equality. The purchase was not for money. In the contract here involved, the vendee took no chances on any drop in the price of wheat for any excess wheat. He need not furnish it. His danger would come from inflated prices.

This weak-minded man gambled not only that the price would not fall below $1, but ran the risk of being compelled to accept extra wheat of any grade at the low price.

The record shows that in October, 1938, after the plaintiff and his mother had mulled it over, the plaintiff complained to the defendant about the terms as being unfair, particularly the provision regarding wheat at $1 per bushel. He was also of the mind the $1,800 would be paid then, but learned otherwise. I realize we are not making contracts for the parties. If a competent vendor enters into a contract which later he believes to be unfair to him, he must accept the hardships with his contract, when there is no deception or unfairness on the part of the vendee. But the fact that a month or two elapsed before it seemed to dawn upon the plaintiff that advantage had been taken of his weakness should not militate against him, for the weaker he is in his mind the longer will it take for him to realize it.

At the close of the case, counsel for the plaintiff stated to the court, "We ask, before we rest, . . . for the privilege of having a psychology test of the plaintiff for the information of the court and the privilege of introducing in evidence the testimony of a recognized psychologist or the report of such psychologist upon the test providing the court would prefer the report rather than the testimony, we ask for that privilege."

Defendant objected on the ground that this would be merely conjectural and would not show the condition of the plaintiff at the time the contract was entered into two years before, and was not proper rebuttal. The plaintiff then stated, "Let the record show we have made an endeavor to have a psychologist make a test."

No ruling was made on this application at that time. On December 4, 1940, counsel for plaintiff moved the court for leave to submit additional evidence based upon a report by Dr. John G. Lamont, the superintendent of the State School for Feeble-minded, showing a test had been made of the plaintiff on November 14, 1940, "and we can definitely state that the man may be classified as a moron." The doctor does not define "moron," but the dictionary definition is "a moderately feeble-minded person," and that "most morons can do routine work under supervision." (There was no supervision of plaintiff when making

this contract.) This indicates the relevancy and materiality of the testimony sought to be furnished. This witness was not available at the hearing on October 16, being in Minot at the time, but his home was in Grafton.

In his memorandum opinion, the court gives as one of the reasons for denying the application, "this case had been running along, tried at different times piecemeal." The record does not show that any delay is chargeable to the plaintiff. The case was commenced in July, 1939. In August the defendant demurred to the complaint. The demurrer was overruled on February 10, 1940. The answer is dated April 13, 1940. The case came on for hearing September 10, 1940. For some reason, not indicated in the transcript, and after a third of the testimony was taken, the hearing was adjourned to October 15, and finished the next day, with a transcript of 265 pages. This delay was not unusual for a court case at chambers.

The psychologist lived at the county seat; no delay need have occurred. The case was not decided until January 31, 1941. So far as the record is concerned, the trial court did not rule on this motion until May 16, 1941—months after he decided the case.

When we consider everything in the case, I cannot reach the conclusion that the plaintiff was competent mentally at the time he entered into the contract.

I realize the weight to be given to the decision of the trial court; but, after all, *we try the facts also.* With all due deference to the distinguished jurist who tried the case, I feel he was in error, and that the judgment should be reversed, and judgment entered for the plaintiff.